Kenneth N. WEXLEY, Plaintiff,

v.

MICHIGAN STATE UNIVERSITY, and Richard Lewis, David Scott, John DiBiaggo, Delores Cook, and Dean Pridgeon, as individuals, Defendants.

No. 5–91–CV–91.

United States District Court,
W.D. Michigan, S.D.

April 19, 1993.

Mark T. Light, Lansing, MI, for plaintiff.

Michael J. Kiley & Kurt E. Krause, Michigan State University, East Lansing, MI, for defendants.

## OPINION OF THE COURT

McKEAGUE, District Judge.

This case presents claims that defendants discriminated against plaintiff, a tenured professor, in the terms and ·conditions of his employment when they suspended him in connection with students' charges of improper sexual advances. Plaintiff, who is Jewish, alleges he was discriminated against because of his religion and ethnic background. Now before the Court is defendants' motion for summary judgment.

## I. FACTUAL BACKGROUND

Plaintiff Kenneth N. Wexley was, at all times pertinent, a tenured faculty member in the Department of Management of the Eli Broad College of Business at Michigan State University. On October 16, 1990, defendant Richard Lewis, Dean of the College of Business and Graduate School of Management, recommended to the University's Provost, defendant David Scott, that formal proceedings be initiated to dismiss plaintiff for gross misconduct. The recommendation was based upon the accusations of four women that plaintiff had made persistent and unwanted sexual advances toward them. Provost Scott initiated formal dismissal proceedings on October 24, 1990, charging plaintiff with gross misconduct in violation of professional ethics, to-wit: "use of professional authority to exploit others, e.g., sexual advances to a student."

Pursuant to the University's tenured faculty dismissal for cause policy, a hearing committee was selected, consisting of seven of the 15 members of the University Committee on Faculty Tenure ("UCFT"). The hearing committee conducted hearings on March 25, March 26, March 28, April 18, and May 6, 1991; and reviewed 14 exhibits presented by the parties before issuing its preliminary written report and decision on September 11, 1991. Five of the six hearing committee members found plaintiff guilty of gross misconduct and recommended he be dismissed.[1]

The committee summarized its fact-findings as follows:

> The Committee concludes that its finding of gross misconduct in this case is constituted by:
>
> (1) persistent pattern of intrusion into students' private affairs through the sexualization of conversations;
>
> (2) denial of a student's right to pursue an education and work with faculty in an atmosphere of intellectual and academic freedom; and
>
> (3) unreasonable use of his authority to take advantage of others in subordinate positions through sexual advances;
>
> all of which are a breach of professional ethics.

On appeal to the UCFT, the hearing committee's finding of guilt was affirmed, but the case was returned to the hearing committee with the recommendation that it fashion a penalty short of dismissal. On reconsideration, the hearing committee again voted 5–1 in favor of plaintiff's dismissal, thus transforming the preliminary report and decision into its final report and decision.

University President, defendant John DiBiaggio, reviewed this final decision and, on May 14, 1992, issued his "response and supporting rationale." He recommended the hearing committee's findings of fact be approved, but that less severe disciplinary action be taken. He recommended plaintiff be suspended, without pay and benefits, from July 1, 1992 to January 1, 1994, and be required to obtain and participate in a program of psychiatric or psychological counselling.

These recommendations were unanimously adopted on June 12, 1992, by resolution of the Michigan State University Board of Trustees upon motion of defendant Trustee Delores Cook, with support of defendant Trustee Dean Pridgeon. Plaintiff found the terms and conditions of the suspension "intolerable and unacceptable." On June 26, 1992, he tendered his resignation, effective July 1, 1992.

---

1. The seventh member of the committee requested and was allowed to be excused after the proceedings began.

This action followed. The second amended complaint, in count II, asserts a claim under 42 U.S.C. § 1983, that the procedure employed by defendants in charging him and finding him guilty violated his due process and equal protection rights. In count V, plaintiff claims the procedure employed by defendants in imposing punishment violated his due process and equal protection rights. Counts I, III and IV contain pendent state law claims.[2] The Court focuses first on the federal law claims which form the basis for the Court's jurisdiction. In their motion for summary judgment, defendants attack both the due process and equal protection claims, contending plaintiff received all the process he was due under the law and has failed to produce any evidence to support a finding that defendants' actions were motivated by discriminatory animus.

## II. SUMMARY JUDGMENT STANDARD

Defendants' motion for summary judgment asks the Court to evaluate the factual support for plaintiff's claims. The Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Ind. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.*, 477 U.S. at 247–248, 106 S.Ct. at 2510 (emphasis in original). If defendants carry their burden of showing there

is an absence of evidence to support a claim, then plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). An issue of fact is "genuine" if the evidence is such that a reasonable jury could find for the plaintiff. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. An issue of fact concerns "material" facts only if establishment thereof might affect the outcome of the lawsuit under governing substantive law. *Id.* A complete failure of proof concerning an essential element of a claim necessarily renders all other facts immaterial. *Celotex, supra,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

## III. DUE PROCESS CLAIMS

To the extent plaintiff's due process claims are premised on alleged defects in the procedure whereby he was charged and found guilty, they have already been dismissed. By opinion and order dated June 1, 1992, this Court, the Honorable Richard A. Enslen, dismissed such claims and expressly denied plaintiff leave to amend the complaint in this respect. Such claims are therefore given no further consideration. Plaintiff's due process claim concerning the procedure employed in imposing punishment, however, is based on facts which culminated only after Judge Enslen's ruling. It is properly presented to the Court in the second amended complaint.

Essentially, plaintiff contends the procedure whereby the Board of Trustees made the final decision to suspend him, based on the advisory reports and recommendations of President DiBiaggio and the UCFT hearing committee, without giving him a further fair opportunity to be heard, was violative of due process. Plaintiff acknowledges that he was allowed, through argument by counsel, to address the Board prior to its decision, but

---

**2.** Count I contains a claim under Michigan's Elliott–Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.*, alleging defendants discriminated against plaintiff in employment based on religion and ethnic background. Count III contains a claim under the Bullard–Plawecki Employee Right to Know Act, M.C.L. § 423.501 *et seq.*, alleging

plaintiff was wrongfully denied prompt access to his entire personnel file during the disciplinary proceedings. In count IV, plaintiff alleges the terms and conditions of the suspension are so intolerable as to constitute a wrongful constructive discharge.

contends he was entitled also to be personally present and to present additional evidence to the Board in response to President DiBiaggio's recommendations.

■ It is clear that plaintiff, a tenured professor, had a legitimate expectation of continued employment at Michigan State University and, therefore, had a property interest protected by due process. *Johnston–Taylor v. Gannon*, 907 F.2d 1577, 1581 (6th Cir.1990); *Frumkin v. Bd. of Trustees, Kent State University*, 626 F.2d 19, 21 (6th Cir.1980). "Due process," however, is a flexible concept. What procedural protections are required in a particular situation depends largely on the circumstances and a balancing of interests:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Yashon v. Hunt*, 825 F.2d 1016, 1022 (6th Cir.1987), quoting *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); see also *Frumkin, supra*, 626 F.2d at 21.

■ In balancing these interests in the context of a public university's management of its faculty, the Sixth Circuit Court of Appeals has recognized that "universities have traditionally been afforded broad discretion in their administration of internal affairs." *Id.*, 626 F.2d at 22. Universities are justifiably reluctant, and due process does not require them, to transform faculty disciplinary proceedings into full-fledged adversarial trials. *Id.* Due process requires that a tenured professor not be discharged without receiving a hearing in which he is informed of the grounds for dismissal and given the opportunity to challenge the sufficiency of those grounds. *Johnston–Taylor, supra*, 907 F.2d at 1581.

■ There is no question but that plaintiff was afforded a lengthy hearing, entailing five sessions during a six-week period, and given abundant opportunity to challenge the sufficiency of the charges against him. The result was the unequivocal determination by a body of plaintiff's peers that he was guilty of gross misconduct and should be dismissed. Plaintiff, ironically, now challenges the process whereby the recommended penalty was reduced to an 18–month suspension, simply because he was not afforded a second full-fledged adversarial hearing before the body which rendered the final decision.

The Board reached its final decision based on review of the "Charge; Hearing Committee Report of 9/11/01; University Committee on Faculty Tenure Decision on Appeal of 12/1/91; Final Report and Recommendations of the Hearing Committee of 12/17/91; Response of President and Supporting Rationale, and other documents related to this matter which are made a part of the minutes of the closed meeting of the Board of Trustees of this date." Resolution, Michigan State University Board of Trustees, June 12, 1992. That such a procedure comports with due process is now well-settled. *Bates v. Sponberg*, 547 F.2d 325, 331–33 (6th Cir.1976); *Crook v. Baker*, 813 F.2d 88, 99 (6th Cir. 1987).

In *Bates*, the court recognized that the hearing afforded a tenured professor was "meaningful" even though it was not conducted in the presence of the authority having final responsibility to determine his discharge. 547 F.2d at 332. The court concluded there was no due process violation where the Eastern Michigan University Board of Regents decided to discharge Professor Bates based upon review of the report and recommendation of the grievance committee, compiled after lengthy hearings, and the report and recommendation of the University President. The court reached this conclusion (a) even though the Board of Regents did not have access to the record of proceedings below, (b) even though the Board of Regents denied the professor's request for a further hearing, and (c) even though the Board of Regents imposed a penalty more severe than that recommended by the grievance commit-

tee. The *Bates* court recognized that efficient administration commonly requires deciding officers to delegate responsibilities, for taking evidence and for sifting and analyzing it, to competent subordinates. 547 F.2d at 332. Such a procedure meets the minimal requirements of due process. *Id.*, at 333. *Accord, Crook v. Baker, supra.*

■ Consistent with these authorities, the Court concludes plaintiff suffered no infringement of due process rights as a result of the manner in which his suspension was imposed. Due process does not require that every decision with potentially adverse consequences be attended by a full-fledged evidentiary hearing. "All that is necessary is that the procedures be tailored, in light of the decision to be made, to the 'capacities and circumstances of those who are to be heard' to insure that they are given a meaningful opportunity to present their case." *Frumkin, supra,* 626 F.2d at 21, quoting *Mathews, supra,* 424 U.S. at 348, 96 S.Ct. at 909. Plaintiff was given fair and abundant opportunity to present his case. That he was not afforded an additional evidentiary hearing by the Board of Trustees does not offend due process. In this respect, there is no genuine issue of material fact; defendants are entitled to summary judgment on plaintiff's due process claim.

## IV. EQUAL PROTECTION CLAIMS

Plaintiff alleges that defendants have subjected him to disparate treatment because he is Jewish, thereby denying him equal protection of the laws. His equal protection claims under 42 U.S.C. § 1983 are measured by the same standards which apply to Title VII employment discrimination claims under 42 U.S.C. § 2000e *et seq.; Risinger v. Ohio Bureau of Workers' Compensation,* 883 F.2d 475, 483 (6th Cir.1989). These standards have been well-defined in the case law and are applied through a tripartite burden-allocation scheme established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), and summarized as follows:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Sec-

ond, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (citations omitted).

■ To carry his initial burden of submitting evidence to support a prima facie case, plaintiff must either present direct evidence of intentional and purposeful discrimination, or circumstantial evidence sufficiently strong to raise an inference that defendants' conduct was motivated by discriminatory animus. Plaintiff asks the Court to find significant the facts (1) that the only other Jewish faculty member who was selected to serve on the hearing committee, Professor Martin Fox, was peremptorily excused; and (2) that the main complaining student had stated that "Jewish men quite often have affairs and their wives suffer in silence." Lorraine M. Hollar dep. tr., p. 36. While these facts are interesting and deserve comment, they do not represent direct evidence that any of the *defendants* discriminated against plaintiff because of his religion or ethnic background.

The University dismissal for cause policy gives each party to the disciplinary proceedings one peremptory challenge. Dismissal of Tenured Faculty for Cause, ¶ II.e.(9). Professor Fox was peremptorily excused by Robert F. Banks, Assistant Provost, who acted in defendant Provost Scott's stead during selection of the hearing committee. He was excused because he had, in past participation as a hearing committee member, "exercised his responsibilities in a problematic fashion." Banks aff., p. 3. Assistant Provost Banks "did not consider Professor Fox's religious faith and/or ethnic background in choosing to excuse him from serving on the Hearing Committee." *Id.* Dr. Banks' affidavit remains unrefuted.

The statement made by Lorraine M. Hollar concerning the promiscuity of Jewish men was made to a third person outside the context of formal proceedings. It was undisputedly the statement not of Ms. Hollar's opinion, but of her mother's opinion. Hollar dep. tr., p. 36.

Thus, neither of the cited items constitutes a clear showing even that Dr. Banks or Ms. Hollar acted with a discriminatory motive. Further, even if Dr. Banks or Ms. Hollar were deemed so motivated, the evidence would nonetheless fail to make out a prima facie case, because plaintiff has presented no basis for concluding that *their* animus should be imputed to any of the *defendants* or otherwise affected the process by which plaintiff was found guilty of gross misconduct. See *Wilson v. Stroh Companies, Inc.*, 952 F.2d 942, 945–46 (6th Cir.1992). There is no causal nexus between the asserted direct evidence of discrimination and the ultimate decision of the Board of Trustees.

■ To establish a prima facie case based on circumstantial evidence, plaintiff must show by a preponderance of the evidence (1) that he belongs to a protected class; (2) that he was qualified for his job; (3) that he was suspended (constructively discharged) despite his qualifications without valid cause; and (4) that defendants have replaced him or sought to replace him with a person of comparable qualifications. See *Simpson v. Diversitech General Inc.*, 945 F.2d 156, 158 (6th Cir.1991); *Shah v. General Electric Co.*, 816 F.2d 264, 268 (6th Cir.1987).

■ Plaintiff satisfies the first two factors. He falls short, however, with respect to the third and fourth. Plaintiff was suspended because he was found to have engaged in gross misconduct in violation of professional ethics, in that he used his professional authority to exploit a student by making sexual advances to her. The offense is, on its face, undisputedly a valid cause for dismissal or other discipline under University policy. The charge against Dr. Wexley, which the hearing committee found to have been proven by clear and convincing evidence, was based primarily on the complaint of Lorraine Hollar. Ms. Hollar was a candidate for a master's degree in business administration. She became acquainted with Dr. Wexley in the spring term of 1989, when she enrolled in a course taught by him. At the same time, Dr. Wexley had been assigned to serve as her advisor. After she sought advice from him concerning a summer internship, a mentor/student relationship developed. During the course of this relationship, spanning the spring, summer and fall terms of 1989, Ms. Hollar charged and the committee found: Dr. Wexley repeatedly initiated inappropriate personal conversations, including references to sex and sexual relationships; Dr. Wexley repeatedly inquired whether Ms. Hollar would like to have a sexual relationship with him, which advances she refused; and Dr. Wexley's advances made Ms. Hollar extremely apprehensive about her participation in an independent study and internship supervised by him. Though Dr. Wexley contested the charge, the hearing committee found his testimony not credible.[3]

Plaintiff Dr. Wexley has filed an affidavit in response to defendants' motion for summary judgment. The affidavit does not refute Ms. Hollar's allegations. Further, while Dr. Wexley did contest her allegations before the committee, he appears to admit that if Ms. Hollar's allegations are accepted as true, then he can legitimately be deemed to have made sexual advances to her. (Brief in opposition to recommendation to suspend, dated June 10, 1992, p. 2). He argues, however, that such conduct cannot be deemed valid cause for dismissal because University policy does not prohibit sexual relationships between faculty members and students *per se.* His position is that sexual advances toward a student warrant dismissal only if made on a

---

**3.** The committee also heard testimony of a non-student who, in 1975, upon inquiring of Dr. Wexley about the business management program at Michigan State University, was subjected to similar inappropriate sexual conversations. Further, the committee noted that Dr. Wexley had been informally and confidentially disciplined by the University in 1986 in conjunction with a former student's complaint of undefined sexual harassment. The committee viewed the evidence as manifesting a pattern of misconduct that warranted dismissal because Dr. Wexley showed no desire to change his conduct and no awareness that his conduct was inappropriate.

"quid pro quo" basis. Since he was not found to have promised anything in exchange for sex, he argues no valid cause for dismissal has been established.

Plaintiff's argument is not persuasive. The policy provision under which he was charged, though not articulately worded, clearly proscribes use of professional authority to exploit students through such means as sexual advances. The policy makes no reference to a "quid pro quo" element. Neither did the hearing committee or Board of Trustee find that Dr. Wexley had made sexual advances of a quid pro quo nature. And clearly, the proscribed exploitation could take place in the absence of an express proposed quid pro quo arrangement. The relative positions of parties to a professor/student relationship are inherently unequal, rendering the subordinate student vulnerable to subtle, but no less injurious forms of exploitation. The allegations of Lorraine Hollar that Dr. Wexley subjected her to repeated, unwelcome, intimidating sexual advances, present precisely the sort of exploitative professional misconduct that may warrant dismissal under the policy. Plaintiff has failed to carry his burden of showing by a preponderance of the evidence, that he was suspended without valid cause.

■ Plaintiff has also failed to show or even allege that defendants have replaced him or sought to replace him with a person of comparable qualifications. Instead, he correctly argues that this final element of his prima facie case may be satisfied by other evidence that raises an inference of discrimination; that is, evidence that similarly situated non-minority faculty members received more favorable treatment. *Shah, supra,* 816 F.2d at 270; *Mitchell v. Toledo Hospital,* 964 F.2d 577, 583 (6th Cir.1992); *Stotts v. Memphis Fire Dep't,* 858 F.2d 289, 295–96 (6th Cir.1988). To satisfy this alternative requirement, plaintiff must show by a preponderance of the evidence that other non-mi-

nority employees who are similarly situated in all relevant respects, received more favorable treatment. *Mitchell, supra,* 964 F.2d at 583; *Stotts, supra,* 858 F.2d at 296; *Shah,* 816 F.2d at 270–71. At the heart of the inquiry whether cited non-minority employees are similarly situated in all relevant respects, are determinations that they have comparable work records and engaged in misconduct of comparable seriousness. *Mitchell,* 964 F.2d at 583–84; *Stotts,* 858 F.2d at 296–98; *Shah,* 816 F.2d at 270–71.

Plaintiff points to various details in the proceedings that led to his suspension and argues that no other tenured faculty member at Michigan State University has been treated in this manner. This argument is not based on evidence, but on a lack of evidence, does not address the requisite criteria, and certainly does not support an inference that plaintiff was discriminated against because he is Jewish.

■ Required to address the "similarly-situated" criteria, plaintiff identifies one other professor, Dr. Gary L. Blanchard, who was charged with undefined sexual harassment-type misconduct by defendants. Stating that Dr. Blanchard is also a member of a protected class, however, plaintiff has not furnished specific information to support a finding that he engaged in misconduct of comparable seriousness and had a comparable work record, and was nonetheless treated more leniently than plaintiff. In fact, defendants assert, Dr. Blanchard was charged with gross misconduct under the same policy provision applied to plaintiff, and was also suspended for 18 months.

Plaintiff has thus failed to present persuasive evidence that similarly situated non-minority faculty members were treated more leniently than he was treated.[4] Absent such a showing, he fails to raise an inference of discrimination and fails to establish a prima facie case. *Shah, supra,* at 270; *Galbraith v.*

4. Plaintiff's argument that Dr. Blanchard's suspension is more lenient because it does not require the same waiver of confidentiality and release of psychological counselling records is to no avail. Given the lack of information concerning Dr. Blanchard's misconduct and past work record, it is impossible to determine that this

minor difference is sufficiently significant to give rise to an inference that plaintiff was treated differently because he is Jewish. Moreover, correspondence from President DiBiaggio to plaintiff shortly after he had refused to accept suspension, makes it clear that the waiver and release requirement was negotiable.

*Northern Telecom, Inc.,* 944 F.2d 275, 281 (6th Cir.1991); *Hull v. Cuyahoga Valley Bd. of Education,* 926 F.2d 505, 513 (6th Cir. 1991).

Plaintiff has clearly failed to satisfy the third and fourth elements of his prima facie case. He has thus failed to make a prima facie showing, by direct or indirect evidence, that he was intentionally discriminated against because of his religion or ethnic background, in either defendants' determination that he was guilty of misconduct or in the imposition of penalty. Because plaintiff has not proven his prima facie case, the burden does not shift to defendants to articulate a legitimate nondiscriminatory reason for the suspension. If it did, the burden would clearly be satisfied by defendants' assertion that plaintiff was suspended because he was found guilty of gross misconduct after having been afforded due process. Plaintiff's proffered evidence, already summarized above, that this reason is pretextual, falls far short of demonstrating that this reason is unworthy of belief or that discriminatory animus more likely motivated the suspension. See *Mitchell, supra,* 964 F.2d at 585; *Irvin v. Airco Carbide,* 837 F.2d 724, 726 (6th Cir. 1987).

Accordingly, the Court concludes plaintiff has failed, in response to defendants' motion for summary judgment, to come forward with evidence sufficient to create a genuine issue of material fact concerning his claims for denial of equal protection. Defendants are entitled to summary judgment in this respect as well.

## V. PENDENT STATE LAW CLAIMS

The foregoing analysis effectively disposes of plaintiff's only claims arising under federal law. The sole premises for federal subject matter jurisdiction have thus been extinguished. Under these circumstances, the Court may decline to exercise continuing "pendent" or supplemental jurisdiction over plaintiff's state law claims. 28 U.S.C. § 1367(c).

Plaintiff's claim for employment discrimination under the Elliott–Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.,* is gov-

erned by substantially the same standards that apply to his equal protection claims. See *Pitts v. Michael Miller Car Rental,* 942 F.2d 1067, 1070 (6th Cir.1991); *Grubb v. W.A. Foote Memorial Hospital,* 741 F.2d 1486, 1492–93 (6th Cir.1984); *Sargent v. Int'l Brotherhood of Teamsters,* 713 F.Supp. 999, 1014–105 (E.D.Mich.1989). Hence, the Court's foregoing evaluation of the evidence presented in support of the equal protection claims applies with equal force and yields the same result with respect to the Elliott–Larsen Civil Rights Act claim. It follows that defendants are entitled to summary judgment with respect to this claim, contained in Count I of the second amended complaint.

With respect, however, to the claims contained in Counts III and IV, under the Bullard–Plawecki Employee Right to Know Act, M.C.L. § 423.501 *et seq.,* and for wrongful constructive discharge, the Court, in the exercise of its discretion, and in the interests of comity, declines to exercise continuing pendent jurisdiction. 28 U.S.C. § 1367(c); *United Mine Workers v. Gibbs,* 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966). The latter claims will be remanded to the Ingham County Circuit Court.

An order consistent with this opinion shall issue forthwith.

## JUDGMENT ORDER

In accordance with the written opinion of the Court of even date,

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment is **GRANTED.**

**IT IS FURTHER ORDERED** that defendants are awarded **JUDGMENT** in their favor with respect to plaintiff's claims contained in count I, count II and count V of the second amended complaint.

**IT IS FURTHER ORDERED** that the pendent state law claims contained in counts III and IV are **REMANDED** to the Ingham County Circuit Court.