Richard W. SMITH, Plaintiff,

v.

The RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA, et al., Defendants.

Civil Action No. 3:99CV00064.

United States District Court,
W.D. Virginia,
Charlottesville Division.

Dec. 22, 1999.

Dane H. Butswinkas, Heidi K. Hubbard, Paul T. Hourihan, Williams & Connolly, Washington, DC, Francis McQuaid Lawrence, Rhonda Quagliana, Charlottesville, VA, for plaintiff.

Richard C. Kast, Earl C. Dudley, Jr., Susan M. Davis (all Associate General Counsel and Special Assistant Attorney General), University of Virginia Office of the General Counsel, Charlottesville, VA, for defendants.

## OPINION

MOON, District Judge.

Plaintiff Richard Smith, a student at the University of Virginia ("University"), has filed this complaint against the Rector and Visitors of the University of Virginia, University President John T. Casteen, III, University Vice–President William W. Harmon, individual members of the University's Board of Visitors, and individual members of the University's Judiciary Committee alleging violations of his due process rights under 42 U.S.C. § 1983. Defendants have moved to dismiss pursuant to Rule 12(b)(6) and/or for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedures. For the reasons set forth below, defendant's motions will be granted in part and denied in part.

## FACTS

In the early morning hours of November 21, 1997, Second–Year University student Richard Smith went for a drive with four of his fraternity brothers. Alexander Kory, another University student who was on foot, encountered Smith and his friends and had what can euphemistically be described as "verbal interactions" with one or more of the car's occupants. Unfortunately, events escalated to the point where Bradley Kintz and Harrison Kerr Tigrett (two of Smith's friends) exited the car to confront Kory. Smith then exited the car and attempted to calm the situation by telling Kory to go home and Kintz and Tigrett to go back to the car. Kory then directed some profanity toward Smith [1] and, in a burst of anger, Smith punched Kory in the face, causing him severe injuries to the face, jaw, and teeth.[2]

---

1. Kory called Smith a "fat ass."

2. While not definitively established, Smith may have also thrown Kory toward the ground and kicked him.

Smith pled guilty to a misdemeanor charge of assault and battery, served 21 days in jail, participated in 400 hours of community service, and attended anger management counseling. Smith also paid all of Kory's medical expenses related to the assault.

Kory initiated student disciplinary charges against Smith, Kintz, Tigrett and a fourth participant pursuant to the procedures of the University Judiciary Committee ("UJC"). The UJC is a student-run disciplinary body charged with handling complaints about student violations of the University's Standards of Conduct. Because the fourth student was scheduled to graduate the following May, Vice President for Student Affairs William Harmon determined that he would not be subjected to a UJC trial and instead reprimanded him and required him to attend counseling.

A UJC hearing for Smith, Kintz and Tigrett was initially scheduled for February, 1998, but was postponed until after the disposition of criminal charges pending against them and was rescheduled for November 21, 1998. The day before the re-scheduled hearing was to take place, Smith and his father met with Harmon to request its postponement. While there is a dispute as to what happened next, Smith alleges that Harmon agreed to postpone the hearing. Smith then asked his student defense representative to contact the UJC chairperson to inform her that the trial was postponed and left Charlottesville to return home to watch his younger brother play in a football game.

Meanwhile, the UJC held its hearing on November 21 despite the absence of Smith, Kintz and Tigrett and the protests of Smith's representative. The UJC found the three guilty and ordered their expulsion from the University. On review, Harmon referred the UJC panel's decision to the University's Judicial Review Board ("JRB"), which is charged with hearing certain appeals of UJC decisions. Smith also directly appealed the decision to the JRB shortly thereafter. On February 11, 1999, the JRB set aside the UJC panel's decision and remanded the matter for a new hearing. Pursuant to the remand, the UJC named a new hearing panel and scheduled a new hearing for April 17, 1999. However, that hearing was canceled when the UJC chairperson recused herself. Subsequently, the UJC determined that it was unable to hear the case in a timely manner and referred it to Harmon, who then appointed a hearing panel consisting of student, faculty and administration representatives to hear the case. This panel convened a hearing on May 17, 1999, at which Smith appeared, witnesses were called, evidence was presented, and factual findings were made. The panel then recommended that Smith be suspended for two consecutive semesters that could include a summer session and perform pro-bono community service. The panel also recommended sanctions for Kintz and Tigrett that included suspension for one semester and community service. The panel forwarded its recommendations to University President John T. Casteen, III.

Smith's student counsel wrote to President Casteen on May 28, 1999, urging him "to modify that portion of the panel's recommendation which asks that these young men be suspended from school." Casteen reviewed the panel's report and recommendations as well as the entire transcript of the hearing testimony and affirmed the findings of guilt reached by the panel.[3] However, he modified Smith's recommended sanctions by imposing a suspension for two full academic years plus community service and participation in an anger and alcohol abuse program. Casteen similarly increased the sanction imposed on Tigrett to suspension for one

---

**3.** The findings of guilt referred only to Kerr and Tigrett, since Smith had decided to plead guilty at the May hearing. Thus, the only open issue concerning Smith was the appropriate level of sanctions, which under University rules could range from an admonition to expulsion.

full academic year. Moreover, Casteen deferred final judgment on the issue pending an appeal of his decision to the JRB, but noted that he had "ultimate and non-delegable statutory responsibility" over the case that he did not wish to waive. The JRB denied Smith's appeal on June 22, 1999.

Smith then filed this lawsuit on July 21, 1999. In Counts One through Five, Smith alleges violations of the Due Process Clause and states claims pursuant to 42 U.S.C. § 1983. Specifically, in Count One Smith alleges that Harmon and various UJC members[4] violated his due process rights when Harmon represented that the November UJC hearing would be postponed, but the UJC proceeded with the hearing in his absence anyway. Count Two names Casteen, Harmon, and members of the University's Board of Visitors ("BOV")[5], claiming that the UJC was acting under their control and that they had failed to properly instruct, train, supervise, and control the UJC Defendants in the performance of their duties. Count Three claims that Casteen and Harmon conducted a sham re-hearing on May 17, 1999 since Casteen was the true decision-maker who ignored the findings of the May 17 hearing panel, substituted his own findings, and imposed a sanction greatly in excess of the recommended sanction and greatly in excess of prior sanctions imposed in similar circumstances. In Count Four, Smith names the BOV members and claims that they had failed to properly instruct, train, supervise and control Casteen. Count Five claims Casteen plus the individual BOV members failed to properly instruct, train, supervise and control Harmon. Count Six claims that the individual UJC members conspired to violate Smith's civil rights in violation of section 1983.

Count Seven makes similar allegations concerning Casteen and Harmon. Finally, Count Eight is a state-law breach of contract claim against the University's Board of Visitors.

Smith requests this Court to issue an injunction compelling Casteen and the individual BOV members to rescind and remove any reference to the two year suspension, compelling all defendants to remove any reference in any University records to the November 21 expulsion, compelling the BOV members to supervise, train and oversee the activities of Casteen, Harmon, and the UJC, and enjoining the UJC Defendants, Casteen, and Harmon from further violations of the due process rights of students accused in University disciplinary proceedings. Smith also seeks a judgment declaring the November 21 UJC decision and Casteen's June 7 decision illegal and in violation of the United States Constitution. Finally, Smith seeks compensatory damages from Casteen, Harmon, and the BOV members in the amount of $750,000, as well as $500,000 in punitive damages and attorneys' fees pursuant to 42 U.S.C. § 1988. Defendants have moved to dismiss and/or for summary judgment. Because extensive documentation has been filed, this Court is able to make some conclusions concerning the case on a summary judgment status; for those claims in which the factual record is less developed, this Court will consider defendant's motion as one to dismiss.

## ANALYSIS

### 1. Motion for Leave to Amend the Complaint

Shortly after defendants filed their motion to dismiss, plaintiff filed a motion for

---

4. The named UJC members are John Hevner, Matthew O'Malley, Steve Saunders, Mark Kringlen, Alton Powell Clark, Priya Kumar, and Emily Halayko.

5. The named members of the Board of Visitors are John P. Ackerly, III, Charles M. Caravati, Jr., Champ Clark, William G. Crutch-field, Jr., William H. Goodwin, Jr., T. Keister Greer, Elsie Goodwyn Holland, Timothy B. Robertson, Terence P. Ross, Albert H. Small, Elizabeth A. Twohy, Henry L. Valentine, II, Walter F. Walker, Benjamin P.A. Warthen, James C. Wheat, III, and Joseph E. Wolfe.

leave to amend the complaint pursuant to Rules 15 and/or 21 of the Federal Rules of Civil Procedure. Specifically, plaintiff's first amended complaint identified several UJC defendants by name who were initially identified as John/Jane Doe. Second, plaintiff added a prayer for modest damages of $200 ($100 compensatory plus $100 punitives) from each of the UJC defendants.[6] Finally, plaintiff recognized that since the University elected to evoke Eleventh Amendment immunity from suit in federal court on the state-law breach of contract claim (Count Eight), he omitted that claim from the first amended complaint.

Since defendants will not be prejudiced by these amendments, this Court will initially grant plaintiff's motion for leave to amend the complaint. Accordingly, all of the analysis in this opinion is in reference to the first amended complaint.

### 2. 11th Amendment Considerations

■ This Court has already held that the Rector and Visitors of the University, as an instrumentality of the state, is immune from suit in federal court. *See Cobb v. The Rector and Visitors of University of Virginia,* 69 F.Supp.2d 815, 823 (W.D.Va. 1999); *see also Collin v. Rector and Bd. of Visitors of Univ. of Virginia,* 873 F.Supp. 1008, 1013 (W.D.Va.1995); *Wilson v. University of Virginia,* 663 F.Supp. 1089, 1092 (W.D.Va.1987); *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Moreover, to the extent that Smith has sued all other individual defendants in their official capacities, those suits are barred to the extent plaintiff

seeks monetary relief. *See Cobb,* 69 F.Supp.2d 815, 823; *see also Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Of course, the 11th Amendment neither bars Smith's suit against the individual defendants in their official capacities to the extent that he seeks prospective injunctive relief, *see Cobb,* 69 F.Supp.2d 815, 823; *see also Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), nor his suit against the individual defendants in their personal capacities for monetary damages. *See Cobb,* 69 F.Supp.2d 815, 823; *see also Hafer v. Melo,* 502 U.S. 21, 27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

### 3. Counts One and Three—Whether the UJC, Harmon, or Casteen violated Plaintiff's Rights

■ In the context of student discipline, the due process clause requires "notice and an opportunity to be heard." *See Dixon v. Alabama State Bd. of Educ.,* 294 F.2d 150 (5th Cir.1961); *Gorman v. University of Rhode Island,* 837 F.2d 7, 12 (1st Cir.1988); *Carey v. Maine Sch. Admin. Dist. No. 17,* 754 F.Supp. 906, 918 (D.Me. 1990); *Reilly v. Daly,* 666 N.E.2d 439, 444 (Ind.Ct.App.1996). Plaintiff cites *Jones v. Board of Governors of Univ. of North Carolina,* 704 F.2d 713 (4th Cir.1983), for the proposition that defendants violated his due process rights, but that case is not entirely applicable here. *Jones* involved a plaintiff who was found guilty of cheating by a hearing panel whose determination was so flawed that it was set aside. Another panel was then convened "whose exact role—whether as *de novo* fact-finder, merely advisory fact-finder, or appellate reviewer—was at best unclear throughout

---

**6.** Plaintiff seeks damages in response to defendant's motion to dismiss the UJC defendants. Plaintiff explained that defendant made the motion in reference to the UJC defendants because plaintiff initially failed to demand damages from them. While recognizing that the UJC defendants were fellow students on whom plaintiff did not wish to impose damages, he did desire an adjudication of the wrongfulness of all defendants' conduct. Thus, plaintiff moved to amend the complaint to seek the monetary award and thus keep them in the suit.

to all concerned." *Id.* at 716. The subsequent panel found plaintiff not guilty, but its decision was either reversed as a finding or was disregarded as advice by the ultimate decision-maker, who reviewed the written record from the tribunal. *Id.* This case differs from Jones in several respects. First, plaintiff never appeared before the initial (November) hearing panel. Second, unlike *Jones* the exact role of the May panel in this case was clear: it existed to conduct a fact-finding hearing and provide sanction *recommendations* to President Casteen. *See* Letter from Vice President Harmon to Richard Smith (May 4, 1999). Finally, unlike *Jones* the May panel's findings were not reversed; instead, Casteen merely modified the panel's sanctions (which were nothing more than recommendations anyway).

■ Notwithstanding *Jones'* inapplicability, this Court is left with the task of separately analyzing plaintiff's claims concerning the November and May hearing panels. There is a factual dispute as to whether Harmon told Smith that the November UJC hearing would be postponed or, on a broader level, whether Smith knew or should have known of Harmon's (lack of) authority to postpone UJC hearings. While Harmon's actions are disputed, this Court must make all factual inferences in favor of the non-moving party and thus assume that Harmon had told Smith that the November UJC hearing would be postponed. If that is the case, then Smith may not have had notice and an opportunity to be heard at the November UJC hearing.

Defendants respond that any alleged violations of Smith's constitutional rights at the November UJC hearing are irrelevant since the panel's decision was set aside anyway and Smith suffered no harm. Defendants cite *Winnick v. Manning,* 460 F.2d 545 (2d Cir.1972), for the proposition that flaws in initial hearings are cured by trials de novo. However, in this case—and unlike *Winnick*—the November UJC hearing was not intended to be preliminary. While Smith may not have been formally expelled from the University, he believed that he was (based on the UJC panel's decision) and did not attend classes for several days. Moreover, Smith has alleged that he was unable to register for classes shortly after the November UJC hearing. Unlike the hearing in *Winnick,* the November UJC hearing could very well have been Smith's last.

While some of the concerns raised by Smith, including bad press, general hostility, and a "poisoned" atmosphere may require greater proof of causation[7], at this stage he has at least pled a valid cause of action. *See Busche v. Burkee,* 649 F.2d 509, 519 n. 13 (7th Cir.1981) ("the injury to [plaintiff's] reputation caused by the truthful (and foreseeable) publicity of the unlawful termination was properly considered by the district court as an element of damages"). Regardless, Smith has alleged substantive harms that resulted from the November UJC hearing including his apparent inability to register for classes and his understandable anxiety about his being "expelled," whether technically true or not, as well as his anxiety and frustration over not being able to participate in the November hearing. *See Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d

---

7. Specifically, Smith alleges that the University's conduct as it relates to the November UJC hearing created a poisoned environment that included his fellow students thinking that he had been "expelled" despite his continuing enrollment at the school, a series of negative newspaper articles urging his "re-expulsion" in the campus newspaper *The Cavalier Daily,* leaflets distributed on-grounds advocating his lynching, and a web-site that was dedicated to counting the number of days since his November 1998 "expulsion." This Court does not reach the merits of these issues at this stage in the litigation except to note that, for damages purposes, plaintiff will need to establish an affirmative link between the defendants' actions at (or relating to) the November UJC hearing and the poisoned environment. *See Taliaferro v. Dykstra,* 434 F.Supp. 705, 708 (E.D.Va.1977), *citing Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

252 (1978); *Merritt v. Mackey,* 932 F.2d 1317, 1323 (9th Cir.1991) (damages awarded for emotional distress resulting from denial of opportunity to be heard, even though termination of employment upheld); *Laje v. R.E. Thomason Gen. Hosp.,* 665 F.2d 724, 728–29 (5th Cir.1982) (damages awarded for mental anguish and distress from deprivation of due process, even though dismissal from employment was justified); *Price v. City of Charlotte,* 93 F.3d 1241, 1245 (4th Cir.1996) (injuries grounded in denial of equal protection alone is capable of supporting compensatory damages). And in any event Smith can always recover nominal damages. *Carey,* 435 U.S. at 266, 98 S.Ct. 1042; *Burt v. Abel,* 585 F.2d 613, 616 (4th Cir.1978).

[redacted] Defendants correctly note that Harmon and the UJC members are entitled to qualified immunity. However, qualified immunity only relates to the issue of monetary damages, and even in that regard it does not protect defendants here. Under *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999), courts "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *See also Conn v. Gabbert,* 526 U.S. 286, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999); *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Here, what plaintiffs are alleging involves a deprivation of an actual constitutional right that was clearly established at the time; thus, defendants are not entitled to qualified immunity for their actions surrounding the November UJC hearing.

The other major issue in this case concerns the May hearing and President Casteen's subsequent decision to suspend Smith for two years. Plaintiff objects to Casteen's role as an ultimate decisionmaker who did not participate in the May hearing. Defendants argue that Casteen is entitled to absolute immunity and cite *Ostrzenski v. Seigel,* 177 F.3d 245 (4th Cir.1999), for the proposition that "quasi-judicial" officials are entitled to absolute immunity when adequate procedural safeguards exist. However, *Ostrzenski* concerned medical review boards—not university presidents in a disciplinary context—and the case's language to which defendants refer is a generalized guidepost describing examples of and prerequisites for absolute immunity. *See id.* at 248–49. Instead, *Wood v. Strickland,* 420 U.S. 308, 320, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), is controlling here and leads to the conclusion that absolute immunity is inapplicable. *See also Cleavinger v. Saxner* 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985).

While absolute immunity for President Casteen may not be the relevant standard, qualified immunity is. However, unlike the defendants involved with the November UJC hearing Casteen's qualified immunity argument does not reach step two of the *Wilson* test since he has failed to allege the deprivation of an actual constitutional right. Plaintiff cites *Goldberg v. Kelly,* 397 U.S. 254, 267, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), to state that, if Casteen was going to be the ultimate decisionmaker, then plaintiff had the right to be heard in a meaningful manner before him. Plaintiff alleges that—since Casteen was not present at the May hearing, since he only reviewed transcripts from that hearing, and since he allegedly was not bound by the factual findings of that hearing—he never had the opportunity to be heard before the true decisionmaker. However, *Goldberg* specifically concerned the termination of welfare benefits which was an important distinction according to the Supreme Court. *See id.* at 264, 90 S.Ct. 1011 (noting that welfare provides "essential food, clothing, housing, and medical care"). Besides, *Goldberg* concerned a scheme in which claimants were deprived of their property interest prior to a full evidentiary hearing; here, any determination was made *after* a full hearing.

■ Due process does not entitle Smith to a hearing before President Casteen so long as Smith's hearing before the May panel was *meaningful. See Bates v. Sponberg,* 547 F.2d 325, 332 (6th Cir.1976) (holding no due process violation when the hearing afforded a tenured professor was "meaningful," even though it was not conducted in the presence of the authority having final responsibility to determine the professor's discharge and even though final authority imposed a penalty more severe than that recommended by the initial hearing committee); *see also Wexley v. Michigan State Univ.,* 821 F.Supp. 479, 484 (W.D.Mich.1993) (due process requires meaningful opportunity to present case and be heard, not that every decision with adverse consequences require a full-fledged evidentiary hearing). Smith was given a hearing at which he appeared, witnesses were called, evidence was presented, and factual findings were made. After the panel made its *recommendation* to Casteen, Smith's student counsel wrote to the President asking him "to modify that portion of the panel's recommendation which asks that these young men be suspended from school."

Pursuant to Smith's request, Casteen modified the panel's recommendation, though not to Smith's liking. This Court notes the irony that, had Casteen modified the panel's recommendation in Smith's favor, then this lawsuit would probably not have been filed. *But see Wexley,* 821 F.Supp. at 483 (challenging a downward modification). However, Smith cannot have it both ways: if he requests that Casteen modify the panel's recommendations, then he is implicitly recognizing the President's authority to do so. Smith cannot then argue that the President abused his authority in modifying the panel's *recommendations* by exercising the discretion that Smith, through his own appeal to Casteen, recognized he had. In his letter of explanation, Casteen detailed his reasons for increasing Smith's sanctions, stated that he had read the panel's recommendations, the (473 page) transcript, and the plaintiffs' appeals. Much of what plaintiff describes as Casteen's "factual findings" are nothing more than his interpretation of the record.[8] Smith's argument that Casteen's decision was arbitrary and capricious also fails; the level of detail in Casteen's letter indicates that he thoroughly evaluated all of the evidence in the case and, based on his evaluation, made a discretionary decision that differed from the panel's sanction recommendation.[9]

---

**8.** For example, plaintiffs complain that Casteen made factual findings about the altercation by concluding that Kory did not seek confrontation. This Court has read the entire 473–page transcript and concludes that Casteen's *interpretation* of the facts as revealed in the transcript is entirely reasonable. Be that as it may, his "finding" does not conflict with the panel's report which did not address the issue, one way or the other, of whether Kory sought confrontation. Similarly, plaintiffs complain that Casteen found that Smith made excuses that he did not find convincing, whereas the panel found that Smith had accepted responsibility for his conduct. This distinction strikes this Court as an argument over whether a glass is half-empty or half full since it is based on an interpretation of the testimony in the transcript rather than a strict finding of facts.

Plaintiffs similarly argue that Casteen engaged in a fact-finding mission when he ordered Smith to participate in an alcohol abuse program despite the panel's finding that alcohol did not play a role in the altercation. However, Casteen never stated that alcohol did play a role in Smith's attack on Kory; instead, he noted that several of Smith's prior incidents of violence resulted from the convergence of Smith's volatile temper and alcohol. Casteen's justification for requiring Smith's participation in an alcohol abuse program does not conflict with the panel's finding but instead represents his interpretation of facts that were readily available in the transcript.

**9.** Much of what Smith implicitly complains about actually indicates that Casteen's decision was not arbitrary or capricious. For example, Casteen noted prior incidents of violence between Smith and other University students that were enunciated in the transcript but did not appear in the panel's report. Casteen may have interpreted Smith's justifications differently from the panel (that he is physically large, that someone insulted his sister, that someone handed him a golf club

Smith's hearing before the May panel was meaningful since Casteen relied on the transcript and evidence (both for and against Smith) developed through the hearing to reach his own conclusions about the scope of sentence to be imposed on Smith. This is precisely the review process that Casteen would have used if he were to *reduce* Smith's sanction instead of increasing it. The fact that Casteen increased the sentence instead, even if the ultimate sentence was severe or significantly greater than that imposed in similar cases in the past, does not then lead to the conclusion that Casteen violated Smith's due process rights.

In sum, due process does not require that the ultimate decision-maker agree with the panel that provides a claimant with a hearing. Otherwise, either every appeal would be meaningless (since the ultimate decisionmaker would be limited to rubber-stamping the lower-panel's recommendations) or due process must require a second hearing before the final decision-maker (which we know is not the case—*see Bates,* 547 F.2d at 332). Thus, this Court need not move past the first step of the *Wilson* test since Smith has failed to allege the actual deprivation of a constitutional right. Needless to say, even if Smith had passed step one by alleging the deprivation of a constitutional right, he could not prevail (at least for damages purposes) under step two. For all of the reasons outlined above, any alleged constitutional violation was not clearly established at the time Casteen recommended Smith's sanctions. *See Wilson,* 119 S.Ct. at 1295. Simply put, Casteen's actions fail to raise to the level of violating clearly-established and particularized rights. *See Gordon v. Kidd,* 971 F.2d 1087, 1096 (4th Cir.1992), *citing Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right").

#### 4. Counts Two, Four, and Five—Failure to Instruct, Train and Supervise

In Counts Two and Five, plaintiff alleges that Casteen, Harmon, and the individual BOV members failed to properly instruct, train, and supervise the UJC defendants and that Casteen and the individual BOV members failed to properly instruct, train, and supervise Harmon with respect to the November UJC hearing. In Count Four, plaintiff alleges that the individual BOV members failed to properly instruct, train, and supervise Casteen with respect to the May hearing and his subsequent review. Plaintiff seeks both damages and injunctive relief under section 1983.

Supervisory liability claims "cannot attach if a defendant merely failed to act or prevent a constitutional deprivation." *Cobb,* 69 F.Supp.2d 815, 833 n. 21, *citing Rizzo v. Goode,* 423 U.S. 362, 377, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). The Fourth Circuit has set forth the elements of a supervisory liability claim under section 1983:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a persuasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994), *citing Miltier v. Beorn,* 896 F.2d 848, 854 (4th Cir.1990); *Slakan v. Porter,* 737 F.2d 368, 373 (4th Cir.1984); *Wellington v. Daniels,* 717 F.2d 932, 936 (4th

during a time of provocation), but the fact that he has specifically enunciated his reasons for differing with the panel's interpretation

indicate that Casteen has thoroughly analyzed the record that the panel developed.

Cir.1983). Thus, supervisory liability claims are not premised upon respondeat superior liability but instead upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Id.* at 798, *quoting Slakan,* 737 F.2d at 372–73; *see also Avery v. County of Burke,* 660 F.2d 111, 114 (4th Cir.1981) (supervisory liability under section 1983 can exist if "policies or customs actually caused [plaintiff's] injuries," which can be established by omissions as well as affirmative acts).

■ This Court is inclined to allow plaintiff's supervisory liability claims in Counts Two and Five to proceed for now. The issues here are differentiated from those in *Cobb.* There, plaintiff's complaint did not contain any allegations that the defendants played an affirmative role in depriving the plaintiff of his constitutional rights. *See Cobb,* 69 F.Supp.2d 815, 833 n. 21. Here, plaintiff has specifically alleged that Casteen, Harmon, and the BOV members—pursuant to official policy, custom and usage—knowingly, recklessly and/or with deliberate indifference failed to carry out their duty to properly instruct, train, supervise and control the UJC members. Plaintiff's claim does not turn on the defendant's failure to correct an incorrect result or even that the procedures used by the UJC were facially invalid. *Cf. Henson v. Honor Comm. of Univ. of Va.,* 719 F.2d 69, 73 (4th Cir.1983) (finding nothing inherently unconstitutional about student-run disciplinary procedures). Instead, plaintiff claims that the UJC violated Smith's rights and the BOV members, Casteen and/or Harmon were at least in part responsible for Smith's due process violations because of their failure to properly train and supervise them. The record is inadequately developed to grant a motion for summary judgment at this stage, but plaintiff has, at minimum, stated a claim upon which relief can be granted. Thus, plaintiff's claim can proceed on Counts Two and Five.

Conversely, this Court will grant summary judgment to defendants on Count Four. If Casteen did not violate Smith's constitutional rights when he reviewed and modified the May panel's decision, then the individual BOV members cannot be held liable for Casteen's (non)-violation.

### 5. Counts Six and Seven—Conspiracy Claims

■ To make a conspiracy claim under section 1983, a plaintiff must show that the defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the plaintiff's] deprivation of a constitutional right." *Hinkle v. City of Clarksburg,* 81 F.3d 416, 421 (4th Cir.1996), *citing Hafner v. Brown,* 983 F.2d 570, 577 (4th Cir.1992). Even acquiescence can amount to a conspiracy agreement. *See Hafner,* 983 F.2d at 578.

Since this Court has determined that plaintiff has failed to state a claim for Casteen's actions relating to the May hearing panel, plaintiff's related conspiracy claims also fail. However, plaintiff's conspiracy claims relating to the November UJC panel present a different story. Defendants limit their argument to the fact that a later hearing was held that cured any defects in the November UJC hearing, but this Court has already rejected that argument for purposes of the motion to dismiss. The fact that a subsequent hearing was held does not, as a matter of law, mean that no conspiracy existed with respect to the November UJC hearing. Since plaintiff has properly pled a conspiracy, their claim in Count VI can proceed to discovery.

### CONCLUSION

Plaintiff's motion for leave to amend is GRANTED. Defendants' motion for summary judgment is granted for all claims concerning or relating to the May, 1999 hearing panel and President Casteen's subsequent decision. Defendants' motion

to dismiss and/or for summary judgment is denied for all claims concerning or relating to the November, 1998 UJC hearing. Specifically, defendants' motion to dismiss Counts One, Two, and Six is DENIED. Defendants' motion for summary judgment is GRANTED as to Counts Three, Four, and Seven. Summary judgment for defendants is GRANTED on Count Five to the extent it purports to state a claim concerning events surrounding the May, 1999 hearing panel; defendants' motion to dismiss and/or for summary judgment on the remainder of Count Five (concerning events surrounding the November, 1998 UJC hearing) is DENIED. Because plaintiff's motion for leave to amend has been granted, Count Eight is not before this Court.

## ORDER

Plaintiff Richard Smith, a student at the University of Virginia, has filed this complaint against the Rector and Visitors of the University of Virginia, University President John T. Casteen, III, University Vice–President William W. Harmon, individual members of the University's Board of Visitors, and individual members of the University's Judiciary Committee alleging violations of his due process rights under 42 U.S.C. § 1983. Plaintiff has moved for leave to amend his complaint. Defendants have moved to dismiss pursuant to Rule 12(b)(6) and/or for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedures. For the reasons set forth in the attached Opinion:

- Plaintiff's motion for leave to amend is GRANTED
- Defendants' motion to dismiss Count One is DENIED
- Defendants' motion to dismiss Count Two is DENIED
- Defendants' motion for summary judgment is GRANTED as to Count Three
- Defendants' motion for summary judgment is GRANTED as to Count Four
- Defendants' motion for summary judgment is GRANTED as to Count Five to the extent it purports to state a claim concerning events surrounding the May, 1999 hearing; the motion to dismiss and/or for summary judgment is DENIED to the extent Count Five purports to state a claim concerning events surrounding the November 1998 hearing
- Defendants' motion to dismiss Count Six is DENIED
- Defendants' motion for summary judgment is GRANTED as to Count Seven

Because plaintiff's motion for leave to amend has been granted, Count Eight is not before this Court.

The Clerk of the Court is hereby directed to send a certified copy of this Order and the attached Opinion to all counsel of record.