**Maurice Guillaume GOODREAU, III, Plaintiff,**

**v.**

**The RECTOR AND VISITORS OF the UNIVERSITY OF VIRGINIA, et al., Defendants.**

**Civil Action No. 3:99CV00102.**

United States District Court, W.D. Virginia, Charlottesville Division.

Oct. 10, 2000.

Dane H. Butswinkas, M. Elaine Horn, Paul T. Hourihan, Williams & Connolly, Washington, DC, for plaintiff.

Richard C. Kast, Susan M. Davis, Associates General Counsel and Special Assistants Attorney General, University of Virginia Office of General Counsel, Charlottesville, VA, for defendants.

## MEMORANDUM OPINION

MOON, District Judge.

Plaintiff Maurice Goodreau, a 1990 graduate of the University of Virginia ("University"), brought this action against the Rector and Visitors of the University, as well as against several members and former members of the University's administration and Honor Committee, as a result of the University's revocation of his degree in 1998. Plaintiff attempts to set forth nine different causes of action for violations of state and federal law against various combinations of Defendants. Plaintiff's first and second claims assert a breach of state contract law against the Board of Visitors and ask for a declaratory judgment against the Board that the de-

gree revocation was an ultra vires act under Virginia law. Plaintiff's third claim arises under 42 U.S.C. § 1983 and alleges Fourteenth Amendment due process violations by all individual Defendants.[1] In his fourth claim, which is also brought under § 1983, Plaintiff asserts that the current and former Rectors of the University, the University President, and the members of the Board of Visitors violated his right to due process under the Fourteenth Amendment by failing to train and oversee the members of the Honor Committee in a proper manner. Plaintiff's fifth claim also arises under § 1983 and alleges that certain former members of the Honor Committee, as well as several John and Jane Does, abridged his rights under the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g. Plaintiff's sixth cause of action, again under § 1983, asserts that the current and former Rectors, the President, and the members of the Board also violated FERPA by failing to train and oversee the Honor Committee. In his seventh cause of action, Plaintiff claims under § 1983 that certain former members of the Honor Committee unlawfully retaliated against him for exercising his rights under FERPA and the United States Constitution. Plaintiff's eighth claim, also under § 1983, alleges that the current and former Rectors, the President, and the members of the Board imposed an excessive fine in violation of the Eighth Amendment by revoking his degree. Lastly, Plaintiff asks for a declaratory Judgment against all Defendants stating that the degree revocation was null and void. In response to Plaintiff's claims, Defendants have filed a motion for summary judgment in accordance with Rule 56 of the Federal Rules of Civil Procedure. For

---

1. The individual Defendants in this case are John P. Ackerly III, current Rector of the University; Hovey Dabney, Rector of the University during the 1996–97 academic year; John T. Casteen III, President of the University; Jennifer Erickson, 1997–98 Chair of the Honor Committee; D. Cabell Vest, 1998–99 Chair of the Honor Committee; James S. Tybur, 1996–97 Chair of the Honor Committee; and Charles M Caravati, Jr., Champ

Clark, William G. Crutchfield, Jr., William H. Goodwin, Jr., T. Keister Greer, Elsie Goodwyn Holland, Timothy B. Robertson, Terence P. Ross, Albert H. Small, Elizabeth A. Twohy, Henry L. Valentine II, Walter F. Walker, Benjamin P.A. Warthen, James C. Wheat III, and Joseph E. Wolfe, members of the Board of Visitors of the University. Plaintiff has also named several John and Jane Does as Defendants.

the reasons set forth below, Defendants' motion will be granted in part and denied in part.

## I. FACTS

Maurice Goodreau matriculated at the University of Virginia in the fall of 1987 as a transfer student from George Mason University. As part of the admissions process,[2] Goodreau acknowledged that he would be participating in the University's Honor System and wrote essays concerning his understanding of the system and the requirements for abiding by it. University literature that Goodreau received during the admissions process and after his matriculation made it clear that the University's Honor System provides for a single sanction and that "permanent dismissal is the only penalty" for a breach of the Honor Code. None of that literature, however, stated that degree revocation was a possibility should a student be convicted of an honor offense after graduation. During the spring of his final year as a student, Goodreau used his position as president and treasurer of a student club to conduct a scheme whereby he stole more than $1500 in University funds by submitting forged or false reimbursement vouchers. Goodreau's actions remained undetected during the remainder of his student tenure, and he graduated from the University in 1990, receiving a Bachelor of Science degree from the McIntire School of Commerce.[3]

At the beginning of the following academic year, the incoming president of Goodreau's former club noticed discrepancies in the organization's records and referred the matter to the University police. In August and September of 1990, Goodreau admitted taking University funds for personal use. As a result of his voucher scheme, Goodreau was served with a warrant for felony embezzlement on October 8, 1990, and he eventually pled guilty to a lesser offense of misdemeanor embezzlement on December 6, 1990. In addition to the criminal investigation stemming from the theft, the University's Honor Committee initiated an honor case against Goodreau in October of 1990.[4]

On or about November 15, 1990, members of the Honor Committee contacted Goodreau by telephone, but he did not cooperate with the investigation because he felt as though there should not be a hearing since he was no longer a student. Goodreau also never spoke with his appointed honor advisor, who would have informed him of the essential aspects of the charges against him, including the fact that a conviction could lead to the revocation of his degree. On November 30, 1990, Honor Committee member Jon Paul Sydnor sent Goodreau a certified letter explaining that he had been accused of an honor offense as a result of his embezzlement of University funds and that he had the right to request a trial within ten days. Sydnor's letter went on to explain that a failure to respond in a timely fashion would be treated as an admission of guilt, which would result in permanent expulsion.

Sydnor's letter itself did not mention the possibility of degree revocation, but there is a dispute as to whether it was accompa-

---

2. Goodreau applied to the University on two occasions. The University rejected his application in 1986, but accepted him in 1987 as a transfer student.

3. The *University of Virginia Undergraduate Record, 1987–1988* states that "[s]tudents who have completed all degree requirements in their major and in their school are granted a degree by the University of Virginia." Under the heading "Degree Requirements," the *Undergraduate Record* also outlines the specific course, credit, grade, and residency requirements for the McIntire School of Commerce.

The *Undergraduate Record* also informs students that the University reserves the right to withhold a student's diploma in the event of financial delinquency.

4. The Honor Committee's bylaws state that it has jurisdiction over students of the university. The bylaws also explain that an accusation is timely if made less than two years after the alleged offense, or less than 45 days after the case has been formally referred to an honor advisor, unless the defendant waives the time limits in writing or the executive committee extends such time limits.

nied by the original letter of accusation, a document explicitly stating that the facts of Goodreau's case warranted a recommendation by the Honor Committee that his degree be revoked. Sydnor claims that, although he cannot remember the contents of the enclosures sent with his letter to Goodreau, it was his practice to include a copy of the written accusation. Goodreau, however, maintains that he never received the written accusation.

On January 18, 1991, Sydnor sent a second certified letter to Goodreau at the same address to which the first was sent, but after several attempts at delivery the letter was returned to sender. In response to interrogatories, Goodreau stated that his residence during the time of the attempted correspondence was the address to which the letter was sent. Sydnor's second letter would have informed Goodreau that his failure to act on the previous correspondence had been taken as an admission of guilt and that the admission would result in his "permanent denial of readmission to the University and a recommendation to the Faculty Senate that [his] diploma be revoked." On the same day that he mailed the second letter to Goodreau, Sydnor informed the University Registrar of the Honor Committee's pending recommendation of degree revocation and instructed that Goodreau should be permanently denied readmission to the University. On March 3, 1991, Sydnor informed Goodreau by telephone that the Committee would be recommending the revocation of his degree.

On March 27, 1991, the Honor Committee wrote to the Dean of the McIntire School of Commerce to recommend that Goodreau's degree be revoked, but the Dean apparently took no action on the letter. On February 14, 1992, the Registrar sent a letter to the Honor Committee concerning outstanding cases, and the Committee responded on February 17, 1992, with a letter stating that Goodreau had been informed by the Committee that it would be recommending revocation of his degree and that he had "left school admitting guilt," making November 29, 1990, his "effective date of dismissal." However, the record contains no evidence of any attempt made by the Honor Committee to investigate the reason that Goodreau's degree had not been revoked at the time of the Registrar's letter, which was written nearly a year after the Committee's recommendation to the Dean of the School of Commerce.

In 1996, after deciding to pursue a masters degree in business administration, Goodreau contacted the University Registrar to inquire about the "enrollment discontinued" notation on his transcript, and the Registrar referred him to the Honor Committee. Goodreau then spoke with Committee member James Tybur, who informed him that he could file a grievance to contest the notation but that such action could result in the revocation of his degree.[5] On September 16, 1996, Goodreau submitted a grievance letter asking that the transcript notation be removed. In his letter, Goodreau admitted misappropriating funds from the University, noted that he was informed of the charges against him but did not participate in the investigation, and stated that he was informed after being found guilty in absentia that the Committee would recommend the revocation of his degree. However, Goodreau also asserted in his grievance that he received a letter from the University telling him that he could keep his degree.[6]

5. There is, however, some dispute as to the content of the conversations between Tybur and Goodreau. Goodreau contends that it was his understanding of his conversation with Tybur that "a recommendation of degree revocation was possible only if [he] contested the validity of the Honor Committee's determination of guilt in [his] case." Thus, Goodreau claims that he limited his grievance letter accordingly.

6. Goodreau initially maintained that he was unable to locate this letter from the University, but he has since stated that it is possible that he did not receive a letter at all but instead was notified by phone, possibly by a representative of the Commerce School. The University has been unable to confirm or deny that any such communication was in fact made.

The Grievance Panel responded to Goodreau's grievance by conducting an investigation and submitting its findings to the Honor Committee in a closed-session meeting held on November 25, 1996. James Tybur then sent a letter to Goodreau informing him of the meeting and the Committee's decision not to change the notation on his transcript and, furthermore, to request that his degree be revoked by the General Faculty. The University responded to the Committee's request by convening an ad hoc faculty committee to consider the case and to make a recommendation to the General Faculty. On March 13, 1997, University President John T. Casteen III notified Goodreau by certified mail of the revocation proceeding and invited him to submit any information that he wished to be considered. President Casteen's letter also provided the date on which the General Faculty would review the matter, but it did not give the location and time of the meeting or invite Goodreau to attend. On April 9, 1997, Goodreau responded by writing to the President and stating that he did not wish to question the procedure or the outcome of the trial, but that he had received the letter explaining that he would not have to turn over his degree.

The faculty committee met and decided to adopt the recommendation of the Honor Committee, although there is a dispute between the parties over whether the committee reviewed the information submitted by Goodreau pursuant to President Casteen's letter before making that decision. The committee was prepared to recommend at the May 1997 meeting of the General Faculty that Goodreau's degree be revoked, but the General Faculty's consideration of the matter was postponed after Goodreau's counsel appealed the Honor Committee's recommendation. At the same time, Goodreau asked for a hearing, but his appeal was denied without a hearing having taken place.

On March 5, 1998, President Casteen again wrote to Goodreau explaining that he could submit information to the faculty committee, and Goodreau submitted materials to the same committee that had decided to endorse the Honor Committee's recommendation a year earlier. The faculty committee again adopted the Honor Committee's recommendation. On April 15, 1998, the General Faculty revoked Goodreau's degree. Approximately twelve members of the General Faculty were present, and the body spent roughly thirty minutes discussing the case. Members of the Honor Committee were invited to participate in the discussion, but Goodreau was not. On May 6, 1998, President Casteen informed Goodreau of the degree revocation.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment should only be granted if, viewing the record as a whole in the light most favorable to the nonmoving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.,* 763 F.2d 604, 610 (4th Cir.1985). In considering a motion for summary judgment, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994) (citations omitted).

## III. ANALYSIS

Defendants have moved for summary judgment with regard to all of Goodreau's claims, and this opinion will address each cause of action separately. Before discussing each individual claim, however, the Court must first examine two of Defendants' arguments that potentially could dispose of several of Goodreau's claims: qualified immunity and the "prior bad acts" defense.

### 1. *Qualified Immunity*

 Defendants' argument that they are protected by qualified immunity from Goodreau's claims under § 1983 must fail. The doctrine of qualified immunity dictates that "governmental officials performing discretionary functions ... generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). There is no dispute in the law that a student at a state-supported school must receive notice and an opportunity for some kind of hearing before receiving a serious disciplinary sanction for non-academic misconduct. *See Dixon v. Alabama St. Bd. of Educ.,* 294 F.2d 150, 158–59 (5th Cir.1961); *see also Smith v. Rector & Visitors of the Univ. of Va.,* 78 F.Supp.2d 533, 537 (W.D.Va.1999) (citing *Dixon* ). If Goodreau's allegations are taken to be true, Defendants actions, during both the original investigation and in the later proceedings that lead to the actual revocation of his degree, may have violated Goodreau's Fourteenth Amendment rights to notice and a hearing that have been clearly established by the case law. Thus, Defendants here are not entitled to qualified immunity.

### 2. *"Prior Bad Acts" Defense*

 Defendants specifically asserted the "prior bad acts" defense for the first time in their Reply Brief, and at oral argument Plaintiff moved to strike the defense as having been improperly raised or, in the alternative, to be allowed additional time to brief the issue. The "prior bad acts" defense would certainly qualify as an affirmative defense, *see* Black's Law Dictionary 55 (5th ed.1979) (defining "affirmative defense" as a "new matter which, assuming the complaint to be true, constitutes a defense to it"), and as such should have been raised in Defendants' Answer, *see* Fed.R.Civ.P. 8(c) ("In pleading to a preceding pleading, a party shall set forth ... any other matter constitut-

ing an avoidance or affirmative defense."). Defendants arguably satisfied Rule 8(c) when they stated as an affirmative defense in their answer that "Plaintiff dishonestly and fraudulently obtained his degree in May, 1990." Furthermore, even if this statement from their Answer were not enough to plead the affirmative defense, the fact that Defendants raised the issue in the context of their motion for summary judgment is not fatal in the Fourth Circuit as long as there was no prejudice or unfair surprise. *See Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 612 (4th Cir.1999) (stating that "there is ample authority in this Circuit for the proposition that absent unfair surprise or prejudice to the plaintiff, a defendant's affirmative defense is not waived when it is first raised in a pre-trial dispositive motion"). Given the statements made in their Answer, Defendants' use of the "prior bad acts" defense in the context of their motion for summary judgment could not have unfairly surprised the Plaintiff. Thus, Goodreau's motion to strike the defense is denied. Furthermore, because the Court has ruled on the merits of the "prior bad acts" defense in his favor, Goodreau's motion for an extension of time to brief the issue is denied as moot.

 Defendants' argument that Goodreau's claims under section 1983 should be barred because they arise out of his own act of theft cannot succeed. It is true that Virginia law commands that "participation in an immoral or unlawful act by plaintiff precludes recovery for injuries sustained *as a result of* that act." *Miller v. Bennett,* 190 Va. 162, 165, 56 S.E.2d 217, 219 (1949) (emphasis added); *see also Suddarth v. Slane,* 539 F.Supp. 612, 616 (W.D.Va.1982) (stating that " '[n]o court will lend its aid to a party who *founds his claims* for redress upon an illegal act' " (quoting *The Florida,* 101 U.S. 37, 43, 25 L.Ed. 898 (1879)) (emphasis added)). However, the "prior bad acts" cases cited by Defendants in their Reply Brief are inapposite to the present suit, which is founded upon alleged

flaws in the process followed by the University in revoking Goodreau's degree and not upon any crimes or honor offenses he may have committed. In fact, *Suddarth*, upon which Defendants rely, illustrates this point. Although the court in *Suddarth* rejected the plaintiff's equal protection claim because it was based upon his own bad act of adultery,[7] the court did not apply the same analysis to the plaintiff's procedural due process claim, but instead focused on the sufficiency of the process that the plaintiff had received. *See Suddarth*, 539 F.Supp. at 620–21. Here, Goodreau has founded his claims not on his own bad acts but on the conduct of Defendants in the proceedings that eventually led to the revocation of his degree. Thus, like their claim of qualified immunity, Defendants' "prior bad acts" defense cannot stand.

### 3. State Law Claims

Goodreau's complaint asserts two state law claims against Defendant Board of Visitors. First, Goodreau claims that the Board committed a breach of contract by revoking his degree. Second, Goodreau argues that the Board had no power under Virginia law to revoke his degree, and he asks for the Court to declare the Board's action ultra vires.

### A. Breach of Contract

■ The parties agree that Goodreau and the University entered into a contractual relationship upon his matriculation and that the terms of their contract were governed at least in part by the literature provided by the University to its students. *See also University of Miami v. Militana*, 184 So.2d 701, 704 (Fla.Dist.Ct.App.1966) ("It is generally accepted that the terms and conditions for graduation are those offered by the publications of the college at the time of enrollment. As such, they have some of the characteristics of a contract between the parties, and are sometimes subject to civil remedies in courts of law."); *Anthony v. Syracuse Univ.*, 224 A.D. 487, 489–90, 231 N.Y.S. 435 (N.Y.App. Div.1928) (stating that "[u]nder ordinary circumstances and conditions a person matriculating at a university establishes a contractual relationship"). Among the representations made by the University to its students in its literature is that all disciplinary proceedings will be conducted "through established procedures containing all elements of due process." Plaintiff has provided evidence sufficient to prove that the University did not have adequate procedures in place to insure due process with regard to degree revocation and also that Goodreau did not in fact receive due process during his revocation proceedings. *See infra* Section III.5.A. Furthermore, because the materiality of a breach is a question of fact, *see Agra, Gill & Duffus, Inc. v. Benson*, 920 F.2d 1173, 1176 (4th Cir.1990) (citing 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 8.16 (1990)), the fact that Goodreau may have committed a prior material breach of the contract which would excuse performance by the University is not enough to defeat Plaintiff's contract claim at this stage in the proceedings. Although the Court notes that the jury's determination of Goodreau's constitutional arguments likely will dictate the result of his contract claim, Defendants' motion for summary judgment as to the cause of action must be denied.

### B. Ultra Vires Action

■ Goodreau has also asked this Court to issue a declaratory judgment under section 8.01–184 of the Code of Virginia that

---

7. In *Suddarth*, a police officer was dismissed from his job because he had committed adultery in violation department regulations. The officer argued that he was deprived of his constitutional right to equal protection because the department had an "unwritten policy" of treating supervisory personnel differently from troopers when reviewing violations of the adultery regulation. *See Suddarth*, 539 F.Supp. at 616. The Court, however, rejected his argument, stating that "since he admits that the conduct he engaged in from which his alleged injuries [under the Equal Protection Clause] now arise was in violation of Virginia law and Department regulations, he may not recover under Section 1983." *Id.* at 617.

the revocation of his degree was an ultra vires act on the part of the Board of Visitors because the Board did not have the statutory authority to issue such a punishment or to delegate authority over such matters to the General Faculty or the Honor Committee. Goodreau bases his request on the argument that the scope of the Board's authority over disciplinary matters is specifically defined and restricted by section 23–9.2:3 of the Code of Virginia, which does not mention degree revocation. This argument fails because it ignores the implied power of the Board. As explained by the Virginia Supreme Court, "it must be remembered that the maxim that the mention of one thing implies the exclusion of another is an aid to statutory construction, not a rule of law." *Gordon v. Board of Supervisors of Fairfax County*, 207 Va. 827, 833, 153 S.E.2d 270, 275 (1967).

The Board of Visitors of the University of Virginia is a corporation. *See* Va.Code. Ann. § 23–69 (2000 Supp.). According to the Virginia Supreme Court, the University "has not only the powers expressly conferred upon it, but it also has the implied power to do whatever is reasonably necessary to effectuate the powers expressly granted." *Batcheller v. Commonwealth*, 176 Va. 109, 123, 10 S.E.2d 529, 535 (1940). Among the powers and duties expressly bestowed upon the Board by statute is the ability to "regulate the government and discipline of the students." Va.Code Ann. § 23–76. Because degree revocation is reasonably necessary to effectuate the Board's power to confer degrees and to regulate student discipline, that power must be implied, giving the Board the authority to revoke a degree for good cause and after due process.

■ This holding is consistent with the rulings of other courts that have considered the issue. *See Hand v. Matchett*, 957

F.2d 791, 794–95 (10th Cir.1992); *Crook v. Baker*, 813 F.2d 88, 92–94 (6th Cir.1987); *Waliga v. Board of Trustees of Kent State University*, 22 Ohio St.3d 55, 488 N.E.2d 850, 852–53 (1986). According to these courts, a university has the inherent power to revoke a degree if (1) there is proper cause for such action and (2) the former student is provided with notice and an opportunity to be heard that is sufficient under the Constitution. *See Crook*, 813 F.2d at 93 (quoting *Waliga*, 488 N.E.2d at 850). Furthermore, the fact that these cases all dealt with academic misconduct, as opposed to a disciplinary infraction such as the one involved in the present case, does not weaken their value as authority, for the rationale set forth in those opinions also applies to the University's ability to revoke a degree for a violation of the Honor System. In *Waliga*, the Ohio Supreme Court reasoned as follows:

> Academic degrees are a university's certification to the world at large of the recipient's educational achievement and fulfillment of the institution's standards. To hold that a university may never withdraw a degree effectively requires the university to continue making a false certification to the public at large of the accomplishment of persons who in fact lack the very qualifications that are certified.

*Waliga*, 488 N.E.2d at 852. Without question one of the "institutional standards" of the University of Virginia is compliance with the Honor System; thus, the University must have the implied power, in certain circumstances and with proper procedural safeguards, to revoke the degree of a student who has violated the Honor System while at the University. Therefore, the defendant's motion for summary judgment is granted with respect to Goodreau's claim that the Board committed an ultra vires act.[8]

8. Similarly, the Board's delegation of degree revocation authority to the General Faculty also was not ultra vires because the implied power to delegate such authority was "reasonably necessary" as a practical matter to implement the Board's power to revoke a wrongly issued degree. Furthermore, the delegation of some administrative responsibility to the Honor Committee was not ultra vires because the Committee had no authority to revoke a degree, but merely had the power to

### 4. Federal Claims

Goodreau has asserted several federal causes of action under § 1983 against various combinations of Defendants, and the Court will now address each of these claims separately.

### A. Due Process Claims Against All Individual Defendants

■ Goodreau's assertion that Defendants denied him due process during the period leading up to the revocation of his degree is the core of this lawsuit, and, because there are genuine issues of material fact with regard to whether Goodreau received the process to which he was entitled under the Constitution, Defendants' motion for summary judgment on this claim must be denied. There is no question that Goodreau was entitled to the protections of due process because he was facing serious disciplinary action from the University. *See Gorman v. University of R.I.*, 837 F.2d 7, 12 (1st Cir.1988). At the very least, Goodreau was entitled to notice and an opportunity to be heard. *See id.* Although Plaintiff's Amended Complaint sets forth a laundry list of possible due process violations by Defendants, Goodreau's arguments on this claim can be discussed more intelligently by organizing them into four categories, and the briefs submitted by the parties on the issue reflect as much. The four categories, which the Court will now analyze separately, are (1) the insufficiency of the notice provided to Goodreau in 1990; (2) the failure by Defendants to follow established procedures and to adhere to assurances made to Plaintiff during the course of the revocation process; (3) the administrative delay preceding the final revocation of Goodreau's degree in 1998, and (4) the failure by Defendants to provide Goodreau with an adequate opportunity to be heard during the proceedings held between 1996 and 1998.

■ First, Goodreau has sufficiently alleged facts that would allow a reasonable jury to find that he did not receive recommend that such action be taken by the proper notice from the University regarding degree revocation. In order for notice to be sufficient under the Constitution, it must inform not only of the charge, but also of the possible sanctions that may be imposed. *See In re Tutu Wells Contamination Litigation,* 120 F.3d 368, 379–81 (3rd Cir.1997). *Tutu Wells* involved a case in which attorneys were suspended without being informed that such a sanction was a possible consequence of their conduct. *See id.* The Third Circuit explained that "particularized notice must ... be given as to the form of the contemplated sanction" because had the attorneys "been on notice that they faced suspension, they doubtless would have utilized their opportunity to be heard to raise different matters." *Id.* at 380–81. Similarly, in the present case, Goodreau has provided evidence that he was not told that degree revocation was a possible result of his Honor Code violation prior to the Committee's initial finding of guilt. Thus, Goodreau has created a genuine issue of material fact with regard to notice, and, as a result, Defendant's motion for summary judgment as to this issue must be denied.

■ Second, Goodreau argues that he was deprived of due process as a result of Defendants' deviation from their own procedures and previous assurances. Although this Court and the Fourth Circuit have recognized that "deviating from an agency's established procedural guidelines in a disciplinary action is not necessarily a violation of constitutional rights," *Cobb v. Rector & Visitors of the Univ. of Va.,* 69 F.Supp.2d 815, 828 (W.D.Va.1999) (citing *Jones v. Board of Governors of Univ. of N.C.,* 704 F.2d 713, 717 (4th Cir.1983)), it remains the law in this Circuit that "significant departures from stated procedures of government and even from isolated assurances by government officers which have induced reasonable and detrimental reliance may, if sufficiently unfair and prejudicial, constitute procedural due process violations." *See Jones,* 704 F.2d at 717

General Faculty.

(citing *United States v. Caceres,* 440 U.S. 741, 752–53 & n. 15, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979)); *see also Jacobs v. College of William & Mary,* 495 F.Supp. 183, 188 (E.D.Va.1980) (holding that the College's failure to follow its own rules implicated the Due Process Clause for purposes of stating a "sufficient claim for relief under § 1983"). Goodreau has submitted evidence sufficient to prove that Defendants deviated from previous assurances, but not from their established procedures.

■ As to procedure, Goodreau argues that he was denied due process in 1997 when the Honor Committee refused to provide him a hearing on his appeal of his 1990 honor conviction. According to Goodreau, the Committee's appeal procedures required a hearing, and because the Committee did not grant a hearing for his appeal it denied him due process by deviating from established procedure. Goodreau's argument cannot stand, however, because Honor Committee procedures simply did not require a hearing for his appeal. According to the Honor Committee By–Laws, a hearing is required for an appeal if (1) the appeal is for good cause and is requested within thirty days of the trial or (2) the appeal is on the basis of new evidence. Goodreau's letter of appeal asserted both good cause and new evidence; he argued that he should be exempted from the thirty day requirement because of the flaws in the 1990 proceedings and stated that his new evidence would be his own testimony, that of supporting witnesses, and other evidence that he would have proffered had he contested the honor charges initially. It appears to the Court, however, that the Committee was well within its discretion both in denying Goodreau an exemption from the time limit for requesting a hearing in a good cause appeal and in determining that the testimony and other evidence that Goodreau would have brought forth originally if he had contested the charges against him did not qualify as new evidence and thus did not require a hearing. Therefore, Defendants' motion for summary judgment

will be granted on the issue of deviation from established procedures.

However, Goodreau has created genuine issues of material fact as to whether he was denied procedural due process because of Defendants' departures from previous assurances upon which he had relied. In fact, Goodreau has set forth evidence sufficient to prove that Defendants, to his detriment, deviated from prior assurances on at least two separate occasions. Goodreau has submitted an affidavit explaining that Honor Committee member James Tybur told him that if he did not contest the validity of his original honor proceeding in his grievance letter then the Committee would not reopen his case, thereby placing him in jeopardy of having his degree revoked. Goodreau goes on to explain that he drafted his letter in reliance on Tybur's warning, being careful to limit his grievance to the propriety of the "enrollment discontinued" notation on his transcript. It is undisputed that the Committee thereafter conducted an investigation into Goodreau's 1990 honor case and subsequently made a renewed recommendation that his degree be revoked. Because this evidence could lead a reasonable juror to find in Goodreau's favor on this issue, he has created a genuine issue of material fact concerning whether or not Defendants denied him due process by reopening his honor case after having told him previously that they would not do so if he limited his grievance to the issue of the transcript notation.

Furthermore, Goodreau has also created a genuine issue as to whether Defendants' reopening of his honor case departed from an even earlier assurance. Specifically, Goodreau has stated in his deposition testimony that sometime in the Spring of 1991 he received a communication, either written or oral, from a University official stating that he would be permanently denied readmission to the University, but that he would not have to return his degree as a result of his in absentia honor conviction. Goodreau also has set forth evidence that

he relied upon this assurance by moving on with his career while holding himself out as a University graduate. Again, viewing Goodreau's evidence in its most favorable light, a reasonable jury could find that Defendants departed significantly from their previous assurances. Thus, because Goodreau has created genuine issues of material fact on the issue of whether he was denied due process under *Jones* by Defendants' deviation from their prior assurances, the Court will deny Defendants' motion for summary judgment on this issue.

Third, Goodreau asserts that he was denied due process because Defendants increased the punishment for his offense after a significant passage of time. In support of this theory, Goodreau draws upon Fourth Circuit authority in the criminal sentencing context. *See United States v. Lundien,* 769 F.2d 981, 986–87 (4th Cir. 1985). In *Lundien,* the defendant was convicted by the district court and sentenced to two concurrent ten year terms. After the defendant had been incarcerated for five days, the district judge corrected an error in his sentence, a correction which increased the defendant's term of incarceration to a total of twenty years. *See id.* at 983. Although its analysis on the issue was dicta because *Lundien* was actually a double jeopardy case, the Fourth Circuit stated that it would be appropriate to assess the sentence enhancement in terms of due process. *See id.* at 986. The Court then went on to explain that, although the five day incarceration prior to the change in the defendant's sentence did not offend the Constitution, "due process may ... be denied

when a sentence is enhanced after the defendant has served so much of his sentence that his expectations as to its finality have crystallized and it would be fundamentally unfair to defeat them." *Id.* at 987 (citing *Breest v. Helgemoe,* 579 F.2d 95, 101 (1st Cir.1978)).[9] Goodreau has set forth evidence that when viewed favorably is sufficient to prove that he received a communication from the University indicating that he would not have to return his degree. He has also asserted that in reliance on that communication he went on with his life and career during the several years that passed between the communication and the University's actual revocation of his degree. Thus, the degree revocation would be a " 'fundamentally unfair' " enhancement of his punishment. *Id.* (quoting *Breest,* 579 F.2d at 101). Like a criminal defendant whose expectation of a sentence of a particular length has crystallized through the passage of time, Goodreau's expectations were firmly established by the final sentence communicated to him by the University. Therefore, if Goodreau's evidence is viewed in the light most favorable to him, he has created a genuine issue of material fact as to whether he was denied due process by Defendants under the *Lundien* analogy. As a result, Defendants' motion for summary judgment must be denied on this issue.

Fourth, Goodreau claims that Defendants violated his right to procedural due process by failing to provide him with an adequate opportunity to be heard during the degree revocation proceedings held between 1996 and 1998. Although a full-dress, adversary hearing was not required

9. It should be noted that the Fourth Circuit has recently called its dicta in *Lundien* into doubt by distinguishing it in *Hawkins v. Freeman,* 195 F.3d 732, 749 (4th Cir.1999) (en banc), a case dealing with a revocation of parole for a parolee who had been erroneously released. However, *Hawkins* does not seem to prevent this court from drawing an analogy to the *Lundien* dicta in the present case because Goodreau's situation, if his evidence is viewed favorably, was not at all similar to that of a parolee. According to Goodreau, he received a communication indicating that the University had decided not to require him to return his degree. Thus, like the defendant in *Lundien,* Goodreau had previously received an unconditional sentence. Furthermore, because the extent to which the *Lundien* dicta remains applicable in this Circuit is uncertain, it would not be appropriate for this Court to dispose of the issue in favor of Defendants at the summary judgment stage.

to conform to due process, Goodreau was entitled at the very least to have a neutral decision maker "hear both sides in considerable detail," whether it be through written or oral testimony. *Dixon,* 294 F.2d at 159. Because there is evidence in the deposition testimony sufficient to support a finding by a reasonable jury that Goodreau's evidence was not properly considered by Defendants during the 1996–1998 revocation proceedings, Plaintiff has created a genuine issue of material fact, and Defendants' motion for summary judgment must be denied as to the issue.

*B. Due Process Claim for Supervisory Liability Against the Current and Former Rectors of the University, the President of the University, and Members of the Board of Visitors*

 As this Court recently explained in *Smith,* the Fourth Circuit has articulated the elements of a § 1983 supervisory liability claim as follows:

"(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'persuasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff."

*Smith,* 78 F.Supp.2d at 541 (quoting *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994) (citations omitted)). Furthermore, in *Smith,* this Court allowed certain of the plaintiff's supervisory liability claims to proceed because the "plaintiff has specifically alleged that [certain defendants]-pursuant to official policy, custom and usage-knowingly, recklessly and/or with deliberate indifference failed to carry out their duty to properly instruct, train, supervise and control the UJC members." *Id.* at 544. Here, Goodreau has put forth through deposition testimony and other evidence sufficient facts to create genuine issues with regard to Defendants' knowledge of problems with the Honor Committee, Defendants' policy of indifference toward those problems, and the causal connection between Defendants' failure to train the Committee properly and the injuries that he suffered. Thus, Defendants' motion for summary judgment on the claim of supervisory liability leading to violations of due process is denied.

*C. FERPA Claim Against Certain Former Honor Committee Members and Several John and Jane Does*

The Family Educational Rights and Privacy Act ("FERPA") provides that a student over the age of eighteen must have "an opportunity for a hearing ... to challenge the content of such student's education records, in order to insure that the records are not inaccurate, misleading, or otherwise in violation of the privacy rights of students." 20 U.S.C. § 1232g(a)(2) (1994) (providing for "the correction or deletion of any such inaccurate, misleading or otherwise in appropriate data contained [in the records]"). If a student requests that a record be amended and the institution decides not to do so, the institution has a duty under the FERPA regulations to inform the student of the decision and of the right to request a hearing. *See* 34 CFR § 99.20 (1999). Furthermore, the regulations establish various procedural requirements for the hearing itself. *See* 34 CFR § 99.21.

 Although there is a split of authority over whether FERPA can form the basis of a claim under section 1983, the trend is to allow such claims, and the Fourth Circuit seems to have adopted this view. *See Lewin v. Medical College of Hampton Roads,* 931 F.Supp. 443, 444 (E.D.Va.1996) (citing cases), *aff'd,* 120 F.3d 261, 1997 WL 436168 (4th Cir.1997). Goodreau has put forth evidence that Defendants denied him his rights under FERPA and its regulations. Therefore, Defendants' motion for summary judgment

with respect to Goodreau's FERPA claim must be denied. The Court notes, however, that even though Goodreau may state a claim for a violation of FERPA, it is evident that he would at most be entitled to nominal damages on this claim. It is well settled that FERPA only allows students to challenge and correct "ministerial error" in their records, not to bring substantive claims regarding the reasons for a particular notation having been made. *Tarka v. Cunningham*, 917 F.2d 890, 891 (5th Cir.1990). Thus, at most, Goodreau was entitled to a hearing on whether ministerial error was involved in the "enrollment discontinued" notation on his transcript. FERPA provided Goodreau with no avenue to challenge the degree revocation itself.

### D. FERPA Claim for Supervisory Liability Against the Current and Former Rectors of the University, the President of the University, and Members of the Board of Visitors

For the reasons set forth above in Sections III.5.B and III.5.C, Defendants' motion for summary judgment with regard to Goodreau's supervisory liability claim under FERPA is denied.

### E. Retaliation Claim Against Certain Former Honor Committee Members

 Defendants' motion for summary judgment must be granted with respect to Goodreau's retaliation claim because he has not provided any evidence upon which a reasonable juror could find that any of the members of the Honor Committee recommended that his degree be revoked in order to retaliate against him for asking for an amendment to the "enrollment discontinued" notation on his transcript. Goodreau cannot employ "mere allegations" in order to defeat De-

fendants' motion for summary judgment, but instead must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Pine Ridge Coal Co. v. Local 8377, United Mine Workers of Am.*, 187 F.3d 415, 421–22 (4th Cir.1999). Thus, in order to survive Defendants' summary judgment motion, Goodreau must allege specific facts that are sufficient to meet the three-part test for retaliation. To prove retaliation, Goodreau must be able to show (1) that he was "engaged in conduct protected by the Constitution or by statute," (2) that Defendants "took adverse action against him," and (3) that there was a causal connection between the protected conduct and the adverse action. *Thaddeus–X v. Blatter*, 175 F.3d 378, 386–87 (6th Cir.1999).

 Goodreau has alleged facts sufficient to meet the first two elements of the three-prong test. First, Goodreau's challenge to what he perceived as an incorrect notation on his University transcript was protected by his First Amendment right "to petition the Government for a redress of grievances," U.S. Const. amend. I,[10] and by his statutory rights under FERPA, *see supra* Section III.5.C. Second, the Honor Committee's recommendation of degree revocation to the General Faculty would certainly qualify as adverse action, for such action would deter a normal person "from the exercise of the right at stake." *Thaddeus–X*, 175 F.3d at 396 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982)). However, Goodreau has not met his burden with regard to the third element, for he has not alleged any specific facts showing a causal connection between his protected conduct and the Honor Committee's recommendation.

 In his Amended Complaint, Goodreau asserts that specific members of the

10. Goodreau is correct in asserting that Defendants' argument that he must show that his speech was a matter of public concern in order to establish First Amendment protection does not apply in this case since he is not a public employee. The public concern requirement only applies in the context of pub-

lic employees. *See Thaddeus–X*, 175 F.3d at 390 ("The story of the public concern limitation is a story about the free speech of public employees. But of course, First Amendment retaliation cases are not limited to that setting.").

Honor Committee "deliberately, maliciously, recklessly, and wantonly initiated degree revocation proceedings ... because they viewed [his] exercise of his rights as a challenge to their purported delegated authority." This statement is a "mere allegation" that cannot overcome Defendants' motion for summary judgment. Furthermore, Goodreau's argument in his brief is also inadequate because it takes a formalistic approach to the causation element that ignores motive and subverts the spirit of the retaliation cause of action. In his brief, Goodreau attempts to establish causation by arguing that "but-for [his] actions in contesting the notation on his transcript in 1996, the 1996 and 1997 Honor Committees would not have sought to revoke his degree." This argument has some basis in the language of retaliation case law. *See Huang v. Board of Governors*, 902 F.2d 1134, 1140 (4th Cir.1990) (stating that "claimant must show that 'but for' the protected expression the employer would not have taken the alleged retaliatory action") (citations omitted). However, Goodreau's argument ignores the essence of the causation requirement, for the cases explain that the protected conduct must be the "but for" cause of the defendant's "retaliatory motive." *Huang*, 902 F.2d at 1141 (stating that the defendant's adverse action "was infected with a retaliatory motive traceable to" the plaintiff's protected speech); *see also Babcock v. White*, 102 F.3d 267, 275 (7th Cir.1996) (discussing "retaliatory motive"). In other words, the plaintiff must show that the defendant sought to punish him for engaging in the protected conduct. Here, Defendants have put forth evidence that they recommended that Goodreau's degree be revoked not because he requested an amendment to his transcript, but because he had been found guilty of an honor offense. Plaintiff has not countered with evidence of his own that Defendants had any kind of "retaliatory motive" with regard to his request for a transcript amendment. Thus, Defendants' motion for summary judgment is granted as to the retaliation claim.

## F. Eighth Amendment Excessive Fine Claim Against the Current and Former Rectors of the University, the President of the University, and Members of the Board of Visitors

Goodreau's claim under the Excessive Fines Clause of the Eighth Amendment is based on the premise that the degree revocation in this case is analogous to a civil forfeiture. Because that analogy misses the mark, Defendants' motion for summary judgment on the Excessive Fines issue will be granted. In *Austin v. United States*, the Supreme Court explained that the "Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'" 509 U.S. 602, 609–10, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) (quoting *Browning–Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989)). The *Austin* Court went on to hold that a civil forfeiture can violate the Excessive Fines Clause as long as "it can only be explained as serving in part to punish." *Id.* at 610, 113 S.Ct. 2801. Once it has been established that the civil forfeiture is a punishment and therefore within the scope of the Eighth Amendment, the next inquiry is to determine whether the fine is excessive. According to the Supreme Court, "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998).

Goodreau begins his argument in support of his Excessive Fines claim with the unsupported statement that "the revocation of [his] degree was the equivalent of a civil forfeiture" and quickly proceeds to a discussion of whether the punishment was in proportion to his offense. However, an examination of Goodreau's proportionality argument reveals a flaw in the analogy between his degree revocation and the civil forfeitures discussed in *Austin* and *Bajakajian*. Plaintiff's brief states that "Mr. Goodreau misappropriated approximately

$1500 in University funds," that he was "convicted of a misdemeanor," and that he "paid full restitution." Plaintiff then asserts that the "additional sanction of stripping Mr. Goodreau of his degree ... inflicted a severe, disproportionate injury upon him." Thus, Goodreau characterizes the revocation of his degree as punishment for his crime of embezzlement, just as the forfeitures in *Austin* and *Bajakajian* were civil punishments arising out of criminal offenses. *See Bajakajian*, 524 U.S. at 328, 118 S.Ct. 2028 (explaining that the forfeiture provision at issue in the case applied when a person had been convicted of a violation of customs law reporting requirements); *Austin*, 509 U.S. at 619, 113 S.Ct. 2801 (stating with regard to the provisions at issue in that case that "Congress has chosen to tie forfeiture directly to the commission of drug offenses"). This analogy is flawed because the University did not revoke Goodreau's degree as a civil sanction for his criminal embezzlement; rather, the decision to revoke his degree arose from his being found guilty of violating the Honor System, an offense completely distinct from the criminal charge. The revocation of Goodreau's degree cannot properly be characterized as a civil forfeiture because it was not imposed as a punishment for an underlying criminal offense; therefore, the revocation does not fall within the scope of the Excessive Fines Clause.

■ Furthermore, as explained above, the University had the inherent authority to revoke Goodreau's degree upon good cause and with the protections of due process. Thus, even if the Excessive Fines clause did apply in this case, the revocation could not be excessive in and of itself, since the University had the power to impose such a sanction. The only argument for the revocation being an excessive fine, therefore, must stem from the delay in imposing the punishment, but that argument is more properly based on a lack of due process. *See supra* Section III.5.A. Therefore, Defendants' motion for summary judgment must be granted with respect to this claim.

*G. Request for Declaratory Judgment Against All Defendants*

Finally, in a claim against all Defendants, Goodreau asks the Court to issue a declaratory judgment that Defendants acted illegally and unconstitutionally under federal law in revoking his degree and that therefore the revocation is null and void. Because Goodreau has set forth evidence showing a genuine issue of material fact with regard to some of his federal claims, Defendants' motion for summary judgment on this final claim also must be denied.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is granted in part and denied in part. Specifically, Defendants' motion for summary judgment is granted as to Plaintiff's second, seventh, and eighth causes of action. Summary judgment for Defendants is denied as to Plaintiff's first, fourth, fifth, sixth, and ninth causes of action. As to Plaintiff's third cause of action, summary judgment is granted as to the issue of deviation from established procedures and is denied as to all other issues.