PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

HARRISON KERR TIGRETT; BRADLEY
CLARK KINTZ,
        *Plaintiffs-Appellants,*

        v.

THE RECTOR AND VISITORS OF THE
UNIVERSITY OF VIRGINIA; JOHN T.
CASTEEN, III; JOHN P. ACKERLY, III;
CHARLES M. CARAVATI, JR.; CHAMP
CLARK; WILLIAM G. CRUTCHFIELD,
JR.; WILLIAM H. GOODWIN, JR.; T.
KEISTER GREER; ELSIE GOODWYN
HOLLAND; TIMOTHY ROBERTSON;
TERENCE P. ROSS; ALBERT H. SMALL;
ELIZABETH A. TWOHY; HENRY L.
VALENTINE, II; WALTER F. WALKER;
BENJAMIN WARTHEN; JAMES C.
WHEAT, III; JOSEPH WOLFE, in their
capacities as members of the
University of Virginia Board of
Visitors; WILLIAM HARMON, in his
individual capacity and in his
official capacity as Vice President
of Student Affairs of the University
of Virginia; KAREN HOLT; TILLMAN
BRECKENRIDGE; SYLVIA TERRY;
CHARLES TOLBERT; SHAMIM SISSON,
in their individual capacities and in
the official capacities as members
of the University's Fact Finding
Panel formed by the Vice President

No. 01-1473

of Student Affairs, William W. Harmon; JOHN HEVNER; MATTHEW O'MALLEY; STEVE SAUNDERS; MARK KRINGLEN; ALTON POWELL CLARK; PRIYA KUMAR; EMILY HALAYKO, in their individual capacities and in their official capacities as members of the University of Virginia Judiciary Committee, Fall 1998,
            *Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Virginia, at Charlottesville.
Norman K. Moon, District Judge.
(CA-99-94-3, CA-00-31-3)

Argued: February 25, 2002

Decided: May 14, 2002

Before WILKINS, NIEMEYER, and KING, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Wilkins and Judge Niemeyer joined.

**COUNSEL**

**ARGUED:** Frank Lee Watson, III, BAKER, DONELSON, BEAR-MAN & CALDWELL, P.C., Memphis, Tennessee, for Appellants. Richard Croswell Kast, Associate General Counsel/Special Assistant Attorney General, Office of the General Counsel, UNIVERSITY OF VIRGINIA, Charlottesville, Virginia, for Appellees. **ON BRIEF:** Frank L. Watson, Jr., BAKER, DONELSON, BEARMAN & CALD-WELL, P.C., Memphis, Tennessee, for Appellants. Paul J. Forch,

General Counsel/Special Assistant Attorney General, Susan M. Davis, Associate General Counsel/Special Assistant Attorney General, Office of the General Counsel, UNIVERSITY OF VIRGINIA, Charlottesville, Virginia, for Appellees.

**OPINION**

KING, Circuit Judge:

Appellants Harrison Kerr Tigrett and Bradley Clark Kintz sued various officials connected to the University of Virginia (the "University") under provisions of the Civil Rights Act of 1871, 42 U.S.C. § 1983. Tigrett and Kintz, both former students at the University, were punished pursuant to its student disciplinary procedures, and they assert in their lawsuit that they suffered multiple deprivations of their constitutional rights. The district court for the Western District of Virginia denied their claims, *Tigrett v. Rector & Visitors of the Univ. of Virginia*, 137 F. Supp. 2d 670 (W.D. Va. 2001), and this appeal followed. As explained below, we affirm.

I.

A.

In the early morning hours of November 21, 1997, Tigrett and Kintz (the "Appellants"), along with three of their fraternity brothers, Richard Smith, Wes Kaupinen, and Wes McCluney, travelled to a convenience store in Charlottesville, Virginia. While returning from the store, they encountered Alexander Kory, another University student, walking on the school's main grounds. Kory then engaged in a hostile verbal exchange with at least one of the five men, and the exchange escalated to the point where McCluney stopped his vehicle and Smith, Kaupinen, and the Appellants exited from it. Kaupinen avoided further hostilities by returning to the fraternity house, but the Appellants confronted Kory. In an effort to calm the situation, Smith instructed Kory to leave, and he directed the Appellants to return to the automobile. Kory then called Smith a "fat ass," and in response Smith punched Kory in the face. The Appellants also may have

kicked and attacked Kory, and, as a result, Kory suffered extensive injuries to his face, jaw, and teeth. A few days after the incident, Smith turned himself in to the University Police, and he later brought the other four students — the Appellants, plus McCluney and Kaupinen — with him to the police station. All five students then made voluntary statements to the University authorities. On December 3, 1997, pursuant to the procedures of the University Judiciary Committee ("UJC"), Kory initiated a student disciplinary complaint against Smith, McCluney, and the Appellants.[1]

B.

The UJC is a student-operated disciplinary body of the University with responsibility for investigating and hearing complaints involving student misconduct, particularly violations of the University Standards of Conduct ("USOC").[2] Pursuant to its By-Laws, a UJC trial must be convened within a reasonable time after the filing of a complaint, and an accused must be accorded reasonable notice of any charges and of the time and place for trial. In each case, a UJC member is appointed as Investigator, and he meets with the complainant, the accused, and other witnesses to ascertain the facts underlying the complaint. The Investigator compiles a Report, which is usually presented at a UJC trial. The trial is conducted before a panel of seven members of the UJC. Pursuant to UJC By-Laws, decisions of a trial panel are automatically subject to review by the University's Vice President for Student Affairs. If the Vice President for Student Affairs concludes that the decision of the trial panel is inappropriate, he may remand the matter to the UJC, or he may refer it to an independent body called the Judicial Review Board ("JRB"), which is composed of faculty, administrators, and students.[3] The JRB possesses the authority to remand the case to the UJC for a new trial, or it may reverse or modify the trial panel's decision.

---

[1]Kory did not initiate any disciplinary charges against Kaupinen.

[2]The UJC is distinct from the University's other student-operated disciplinary system, the Honor Committee, which hears cases involving only three infractions: lying, cheating, and stealing.

[3]The JRB is an eleven-member body, five of whom are students, and it hears appeals in three-member panels.

C.

1.

Kory's complaint alleged that Smith, McCluney, and the Appellants violated Section 1 of the USOC, which prohibits physical or sexual assault,[4] and Section 5 of the USOC, by blocking traffic on University property.[5] Because McCluney was scheduled to graduate at the end of the following semester, the Vice President for Student Affairs, William Harmon, determined that he would not be subjected to a UJC trial. Instead, Harmon reprimanded McCluney and required that he attend aggression counselling sessions before he could receive his University diploma. The UJC initially scheduled the trial of Smith and the Appellants (collectively, the "UJC Defendants") for February 19, 1998, but the trial was postponed pending resolution of criminal charges in the state court of Albemarle County, Virginia.

In May 1998, Smith was convicted in state court of assault and battery, on the basis of a nolo contendere plea. The Appellants and McCluney also entered pleas of nolo contendere and were convicted of disorderly conduct. The UJC thereafter rescheduled the trial of the UJC Defendants for November 21, 1998, before a seven-member UJC panel (the "1998 UJC Panel").

Prior to their trial (the "UJC Trial"), the disciplinary charges against the UJC Defendants were amended to include a charge under Section 8 of the USOC, which prohibits disorderly conduct.[6] Accord-

---

[4]Pursuant to Section 1 of the USOC, the following constitutes an offense: "Physical or sexual assault of any person on University-owned or leased property or at University-sponsored or supervised functions . . . within the City of Charlottesville or Albemarle County."

[5]Section 5 of the USOC prohibits "[u]nlawfully blocking or impeding normal pedestrian or vehicular traffic on or adjacent to University property."

[6]Section 8 of the USOC prohibits "[d]isorderly conduct on University-owned or leased property or at a University-sponsored function." Disorderly conduct is defined "to include acts which break the peace or are lewd, indecent or obscene and which are not constitutionally-protected speech."

ing to the Investigator, the UJC Defendants were notified of the Section 8 charge when they received his Report, which occurred at least forty-eight hours before the UJC Trial was scheduled.[7]

On November 20, 1998, the day before trial was to begin, the UJC Defendants, along with Smith's father and his student counsel, met with Vice President Harmon to express concerns about the trial. After the Appellants left the meeting, Smith and his father continued their discussions with Harmon. Smith subsequently asserted (as do the Appellants on appeal) that Harmon assured him that the trial would not go forward the next day. At approximately seven o'clock that evening, Smith's student counsel filed a motion requesting that the trial be postponed, which the UJC denied later that night. Smith's student counsel promptly advised the UJC Defendants that their trial would be conducted as scheduled, but they nevertheless decided not to attend. Because Harmon had represented that the trial would not proceed, the UJC Defendants believed that any trial conducted in their absence would be invalid.

Although the UJC Defendants failed to attend, their trial was conducted the next day. Following presentation of the prosecution's evidence, the 1998 UJC Panel found each of the UJC Defendants guilty on all three charges: violating Section 1 (physical assault), Section 5 (blocking traffic), and Section 8 (disorderly conduct), and the Panel recommended their expulsions from the University. By letters of November 21, 1998, the UJC informed the three UJC Defendants of the expulsion sanctions, and it advised them of their right to appeal the decisions to the JRB. These letters failed to reflect that, pursuant to the UJC's By-Laws, the decisions were automatically subject to review by the Vice President for Student Affairs, i.e., Vice President Harmon. On November 23, 1998, the UJC wrote to Harmon, requesting "finalization of its expulsion sanctions." Without a response from or the approval of Harmon, the UJC then wrote the University's Registrar, on November 24, 1998, requesting that she mark "enrollment discontinued" on the transcripts of the UJC Defendants. After consult-

---

[7]It is undisputed that the UJC Defendants "reviewed multiple drafts of the report, listing the Section 8 charge, before the report was finalized 48 to 72 hours before the November hearing." *Tigrett v. Rector & Visitors of the Univ. of Virginia*, 137 F. Supp. 2d 670, 678 (W.D. Va. 2001).

ing with Harmon, however, the Registrar did not mark anything on their transcripts, and she declined to discontinue their enrollments. Instead, the Registrar wrote the words "Not Processed" at the bottom of the UJC's letters.

On November 25, 1998, Vice President Harmon declined to finalize the expulsions. He instead acknowledged "perceived procedural irregularities and misunderstandings," and he referred the case to the JRB. Pursuant to the JRB's Procedures For Appeals, the UJC Defendants each appealed to the JRB. The Chairperson of the JRB then appointed a three-member Appellate Review Panel, consisting of a professor, an administrator, and a student, to handle their appeals. On February 11, 1999, the Review Panel set aside the recommended expulsions and remanded the case to the UJC for a new trial.

2.

Following remand, the UJC convened a new trial panel and scheduled a second trial for April 17, 1999. On April 10, 1999, it again notified the UJC Defendants that they were charged with violations of Sections 1, 5, and 8 of the USOC. Prior to the new trial, however, allegations of bias surfaced concerning the panel Chair, who recused herself. This panel was disbanded, and the UJC then determined that it lacked sufficient membership to form another panel and resolve the charges in a timely manner.[8] By letter of May 4, 1999, the UJC relinquished control of the case, referring the matter to Harmon for disposition.[9]

---

[8]The disciplinary proceedings against the UJC Defendants, particularly the JRB's remand to the UJC and the subsequent disbanding of the new trial panel, were of great interest in the University community. The student newspaper, *The Cavalier Daily*, carried a flurry of opinion pieces and editorials criticizing the asserted interference by the University administration in the proceedings and calling for expulsion of the UJC Defendants. On April 27, 1999, approximately 400 students conducted a rally on the University Lawn in support of Kory and critical of the UJC Defendants.

[9]In turning the matter over to Harmon, the UJC requested that one of its members be included on whatever panel was created to resolve the case, and it asked that all decisions relating to the matter be copied to the UJC.

Vice President Harmon then appointed a five-member factfinding panel, consisting of a law student (a member of the UJC), a professor, and three administrators, to hear the pending charges (the "1999 Panel").[10] By letters of May 4, 1999, Harmon notified the UJC Defendants that the charges against them would be heard by the 1999 Panel, and they were advised that this panel would not be governed by the rules and practices of the UJC. Harmon further informed them that "[t]he panel will make findings of fact with respect to the pending charges and recommend an appropriate sanction to the President (or his designee) in the event of a finding of guilt." Harmon also specified that President Casteen would be the ultimate decisionmaker, and that the Appellants would have the right to appeal the President's decision to the JRB "on the grounds that the sanction was unduly harsh, clearly excessive or grossly inappropriate to the offense, or for procedural error in violation of due process that had a substantial negative impact on the outcome." The JRB would be the final appeal "except on written permission to the Board of Visitors in the case of expulsion."

The 1999 Panel convened its trial on May 17, 1999 (the "1999 Trial"). At the trial's outset, Smith entered a plea of guilty to Sections 1, 5, and 8 of the USOC; the Appellants, on the other hand, tendered not guilty pleas to all three charges. The 1999 Panel then conducted a thirteen-hour trial at which witnesses were examined and evidence was presented. Shortly thereafter, the Panel completed its "Report of Fact Finding Panel" (the "Report"), and, by letter of May 27, 1999, forwarded it to the University's President, John T. Casteen, III, and copied it to the UJC Defendants. The Report concluded that the Appellants had "engaged in behavior which threatened the health or safety of Mr. Kory," and it found them guilty of violating Section 1 of the USOC. Additionally, the Report unanimously found that they had "engaged in disorderly conduct on University-owned property," and it found them guilty of violating Section 8 of the USOC. How-

---

[10]The University had not previously created such a factfinding panel, nor does it appear that such a panel is specifically contemplated by University regulations or the By-Laws of the UJC. However, pursuant to Article II, Section C of its Constitution, the UJC "may, within its discretion, refer cases to the Vice President for Student Affairs for disposition." This provision provides Harmon with ample authority to create such a panel.

ever, the 1999 Panel decided that it "could not fairly conclude that the facts constituted an unlawful blocking of normal pedestrian traffic," and it therefore found the Appellants not guilty of violating Section 5 of the USOC. The Report recommended that Smith be suspended for two consecutive semesters (which could include one summer session) and that he be required to perform 100 hours of community service. It also recommended that the Appellants be suspended for one semester (not to include a summer session) and that they each perform seventy-five hours of community service. In response to the Report, the Appellants' lawyers, by letters of May 28, 1999, and June 1, 1999, urged Casteen to reject the recommendations.

After reviewing the Report, the transcript of the 1999 Trial, and the correspondence of the Appellants' lawyers, President Casteen, on June 7, 1999, "affirm[ed] the findings of guilt reached by the panel." He adopted the Report's recommended sanction as to Kintz, imposing academic suspension for one semester plus seventy-five hours of community service. As to Smith and Tigrett, however, Casteen imposed more severe sanctions than had been recommended by the Report. With regard to Smith, he imposed two full years of academic suspension, rather than the one-year suspension recommended by the 1999 Panel, plus 100 hours of community service. Casteen suspended Tigrett for a full academic year, instead of the one semester recommended by the 1999 Panel, and he imposed seventy-five hours of community service. Tigrett promptly appealed Casteen's sanction to the JRB. His appeal was rejected on June 22, 1999, when the JRB determined that his case was "final under University procedure."

3.

Shortly thereafter, on October 27, 1999, Tigrett filed an eleven-count complaint in the Western District of Virginia against the Rector and Visitors of the University, President Casteen, Vice President Harmon, the members of the Board of Visitors (the "Board"), the members of the 1998 UJC Panel, and the members of the 1999 Panel (collectively, the "University Defendants").[11] Tigrett alleged ten sepa-

---

[11]Smith had filed an earlier suit in the Western District of Virginia against the Rector and Visitors of the University, President Casteen, Vice

rate due process and First Amendment claims under § 1983, as well as a state law contract claim, all arising from the handling of the student disciplinary charges made against him. On December 7, 1999, the University Defendants moved for dismissal of the complaint, or, in the alternative, for summary judgment on the various claims. By Opinion and Order of May 12, 2000, the district court addressed the University Defendants' contentions, *Tigrett v. Rector and Visitors of the Univ. of Virginia*, 97 F. Supp. 2d 752 (W.D. Va. 2000). In that Opinion, the court determined that the Rector and Visitors of the University were immune from suit and it dismissed them. It further concluded that the University Defendants were immune from monetary damages in their official capacities, but that they were subject to suit in their personal capacities and for injunctive relief. With regard to Tigrett's specific claims, the court dismissed his state law contract claim, except to the extent that it sought prospective injunctive relief, and it partially granted the University Defendants' motion for summary judgment.

On April 6, 2000, Kintz filed a separate civil action against the University Defendants, which contained allegations nearly identical to those made by Tigrett in his October 27, 1999, complaint. On August 30, 2000, Kintz's lawsuit was consolidated with what remained of Tigrett's claims. On January 30, 2001, the University Defendants sought summary judgment on the claims of the Appellants. The court thereafter issued its Memorandum Opinion and Order of March 2, 2001, awarding summary judgment to the University Defendants on all of the remaining § 1983 claims. *Tigrett v. Rector & Visitors of the Univ. of Virginia*, 137 F. Supp. 2d 670 (W.D. Va. 2001). With no federal claims remaining in the case, the court declined to exercise jurisdiction over the Appellants' state law contract claims, and it

---

President Harmon, the members of the Board, and the members of the 1998 UJC Panel. The court awarded summary judgment to the defendants on most of Smith's claims. *Smith v. Rector & Visitors of the Univ. of Virginia*, 78 F. Supp. 2d 533 (W.D. Va. 1999); *Smith v. Rector & Visitors of the Univ. of Virginia*, 115 F. Supp. 2d 680 (W.D. Va. 2000). However, in October 2000, certain of Smith's claims went to trial and were rejected by a jury.

dismissed those as well. The Appellants filed a timely notice of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.[12]

## II.

We review an award of summary judgment de novo. *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing an award of summary judgment, we view the facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.

In their appeal, the Appellants maintain that the district court erred in three specific respects in its award of summary judgment to the University Defendants. First, they contend that the trial conducted in their absence by the 1998 UJC Panel resulted in their expulsion from the University, and that the trial violated their Fourteenth Amendment due process rights. Second, they assert that the court erred in concluding that they possessed no due process right to appear before President Casteen, the final decisionmaker in their case. Finally, they maintain that the court failed to recognize that Casteen, Harmon, and the members of the Board violated their due process rights by failing to properly instruct, train, supervise, and control the 1998 UJC Panel. We address each of these contentions in turn.

---

[12]In the court proceedings below, the University Defendants unsuccessfully contended that they were entitled to qualified immunity for actions taken in their personal capacities. Although the University Defendants assert this position on appeal, they did not cross-appeal on the issue of qualified immunity. As such, and because resolution of qualified immunity issues is unnecessary to our disposition of this case, we need not address them.

## A.

### 1.

The Appellants first assert that the 1998 UJC Panel in fact expelled them from the University, and that it did so in a manner that violated their Fourteenth Amendment due process rights. Specifically, they maintain that their due process rights were contravened because: (1) they did not receive adequate notice that the UJC Trial was going forward; (2) they had no opportunity to appear and defend themselves; (3) they had no opportunity to cross-examine witnesses; (4) they failed to receive adequate notice of the disorderly conduct charge; and (5) the 1998 UJC Panel violated its internal procedures by, inter alia, allowing the participation of outside attorneys. Each of these claims must fail, however, because the Appellants were not expelled from the University by the 1998 UJC Panel, and hence they could not have been deprived of any constitutionally protected Fourteenth Amendment interest.

The Supreme Court has assumed, without actually deciding, that university students possess a "constitutionally protectible property right" in their continued enrollment in a university. *Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214, 223 (1985); *see also Board of Curators of the Univ. of Missouri v. Horowitz*, 435 U.S. 78 (1978)(assuming that academic dismissals from state institutions can be enjoined if they are arbitrary or capricious); *Henson v. Honor Comm. of the Univ. of Virginia*, 719 F.2d 69 (4th Cir. 1983) (assuming that student had "protectable property or liberty interest" in Honor Committee disciplinary proceeding). The Appellants contend that, as a result of the decision of the 1998 UJC Panel, they were each "expelled from the University effective immediately." As such, they assert that they were deprived of a constitutionally protected Fourteenth Amendment interest in their continued enrollment in the University.

Assuming the Appellants possessed some constitutionally protected interest in continued enrollment, they were not deprived of such an interest by the actions of the 1998 UJC Panel. Although the Panel recommended the expulsions of the UJC Defendants, that is all the Panel was empowered to do. No expulsions could occur, under University

Rules, unless Vice President Harmon ratified the Panel's decision. Pursuant to the UJC's By-Laws, sanctions imposed by the UJC are automatically subject to review by Harmon, and he refused to ratify the recommended expulsions. Instead, citing "procedural irregularities and misunderstandings," he forwarded the case to the JRB, which set the recommended expulsions aside and remanded the matter to the UJC for a new trial. Thus, pursuant to the By-Laws of the UJC, the Appellants were not expelled by the 1998 UJC Panel, nor were they expelled pursuant to its recommendations.

Moreover, the apparent attempts by the UJC to hasten the Appellants' proposed expulsions were rebuffed by the University administration. By letters of November 24, 1998, the UJC requested the Registrar to write "enrollment discontinued" on the Appellants' transcripts. The Registrar, however, consulted with Harmon and was instructed not to comply with this request. Rather than marking the transcripts "enrollment discontinued," she wrote the words "Not Processed" at the bottom of the UJC's letters. The Registrar's refusal to discontinue the Appellants' enrollments confirms the fact that they were not expelled by the 1998 UJC Panel.[13]

Put most simply, when the evidence is viewed in the light most favorable to the Appellants, they were not expelled by the 1998 UJC Panel. Indeed, they each continued to be enrolled at the University, and they were not prevented from attending classes. And not having been sanctioned by the 1998 UJC Panel, i.e., not having been deprived of any constitutionally protected interest, this aspect of their appeal must fail.

---

[13]In attempting to demonstrate that they were expelled immediately after the decision of the 1998 UJC Panel, the Appellants focus on the deposition of Gordon Burris, a Special Assistant to the University's President. Burris testified that in December 1998 or January 1999 a "block" was placed on Tigrett's transcript that inhibited him from registering for the next semester's classes. However, in investigating the block, Burris learned that Vice President Harmon had already requested that it be removed, clearing the way for Tigrett to register for classes. More importantly, Tigrett has proffered no evidence that the block resulted from the expulsion recommended by the 1998 UJC Panel.

2.

In the alternative, the Appellants maintain that, even if they were not actually expelled by the 1998 UJC Panel, their due process rights were violated because they had a reasonable belief that they had been expelled. In support of this contention, they rely on a 1998 decision rendered in the Eastern District of New York, *Sundbye v. Ogunleye*, 3 F. Supp. 2d 254, 264 (E.D.N.Y. 1998), where the court observed that it would "reject the suggestion that plaintiff must actually have been deprived of her liberty interest, and that her mere reasonable belief that such a deprivation had occurred is insufficient." As the Supreme Court has recognized, however, "[t]he first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *American Mfr's Mut'l Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999); *see also Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) ("Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."). Whether a deprivation of constitutional rights has occurred is not dependent upon the subjective feelings or beliefs of a plaintiff. In order to properly maintain a due process claim, a plaintiff must have been, in fact, deprived of a constitutionally protected liberty or property interest.

The Appellants are unable, in this setting, to show that they were actually deprived of any constitutionally protected interest. And the Court has plainly and repeatedly recognized that an injury to reputation alone does not deprive an individual of a constitutionally protected liberty interest. *See Siegert v. Gilley*, 500 U.S. 226, 233 (1991) (stating that "injury to reputation by itself [i]s not a 'liberty' interest protected under the Fourteenth Amendment.") (citing *Paul v. Davis*, 424 U.S. 693 (1976)). As such, injuries to the reputations of the Appellants resulting from improprieties by the 1998 UJC Panel are not actionable under § 1983. Additionally, although the Appellants contend that they suffered emotional distress and mental anguish, there is no evidence supporting these contentions. In seeking damages for emotional injury, a plaintiff cannot simply rely on "conclusory statements" or "the mere fact that a constitutional violation occurred." *Knussman v. Maryland*, 272 F.3d 625, 640 (4th Cir. 2001) (citing *Price v. City of Charlotte*, 93 F.3d 1241, 1254 (4th Cir. 1996)).

Rather, the plaintiff "must establish that [he] suffered demonstrable emotional distress, which must be sufficiently articulated." *Id.* (quoting *Price*, 93 F.3d at 1254). Having failed to produce any such evidence, the Appellants' claims of emotional distress and mental anguish must also fail.

B.

The Appellants next maintain that their due process rights were violated when President Casteen imposed upon them more severe sanctions than those recommended by the 1999 Panel. Specifically, they assert that Casteen was both the ultimate factfinder and the final decisionmaker, and that they were entitled to appear before him prior to his decisions. This contention is likewise without merit.

As an initial matter, the Appellants are mistaken in their claim that President Casteen was the ultimate factfinder. On the contrary, the 1999 Panel, which afforded them a thirteen-hour trial in which they fully participated, was the factfinder. President Casteen merely reviewed the findings of fact made by the 1999 Panel. While the Appellants correctly maintain that Casteen was the ultimate decisionmaker, and that he meted out their respective one-year and one-semester suspensions, *see supra* at 9, their contention that they possess some due process right to appear before the final decisionmaker is without merit. In *Bates v. Sponberg*, 547 F.2d 325 (6th Cir. 1976), the Sixth Circuit held that a tenured university professor could be dismissed by a Board of Regents without being afforded a hearing before that entity. Bates had appeared and presented evidence before a faculty grievance committee, which recommended his dismissal, but he was denied the opportunity to appear before the Board, which made the ultimate decision to terminate him. In ruling against him, the Sixth Circuit observed that:

> *the crux of the issue*, in terms of due process under the Fourteenth Amendment, *is* not whether the due process hearing to which Professor Bates may have been entitled was held in the presence of the authority having final responsibility to determine his discharge, but instead *whether the hearing accorded him was meaningful*.

*Id.* at 332 (emphasis added); *see also Wexley v. Michigan St. Univ.*, 821 F. Supp. 479 (W.D. Mich. 1993) (rejecting professor's claim that he was deprived of due process in being suspended by Board of Trustees without being afforded an opportunity to appear before it).

In the absence of a constitutional or statutory deprivation, the federal courts should be loathe to interfere with the organization and operation of an institution of higher education. *See Ewing*, 474 U.S. at 225 n.11 ("University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation."); *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring in result) (explaining that it is an "essential freedom" of a university to make its own judgments on selection of its student body); *see also Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) (stating that courts "cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values"); *Quarterman v. Byrd*, 453 F.2d 54, 56 (4th Cir. 1971) (recognizing that in matters of school discipline the courts should "defer to the 'expertise' of the school authorities"). There is simply no controlling authority for the proposition that the Appellants possessed a constitutional right to appear before President Casteen prior to his final decisions. Due process, as the Sixth Circuit explained, mandates only that they be afforded a meaningful hearing. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.") (citation and quotation omitted); *Richardson v. Eastover*, 922 F.2d 1152, 1160 (4th Cir. 1991).

The thirteen-hour trial accorded the Appellants by the 1999 Panel included the examination of witnesses and a thorough presentation of evidence. They were present throughout, and they were afforded a full opportunity to participate and to testify (which they declined). Their positions were made clear in the record of the 1999 Trial, which was reviewed and analyzed by President Casteen. And those positions and arguments were supplemented by written submissions made to Casteen prior to his decisions in their case. *See supra* at 9. In these circumstances, the Appellants were afforded the meaningful hearing to

which they were entitled under *Mathews v. Eldridge*, and their contention to the contrary must be rejected.

## C.

Finally, the Appellants contend that President Casteen, Vice President Harmon, and the members of the Board violated their due process rights by failing to properly instruct, train, supervise, and control the 1998 UJC Panel. This claim, made pursuant to a theory of § 1983 liability commonly referred to as "supervisory liability," is without merit as well.

In our recent decision in *Baynard v. Malone*, 268 F.3d 228 (4th Cir. 2001), we had occasion to address the viability of a supervisory liability claim. As Judge Wilkins observed in that case, "[i]t is well settled that supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Id.* at 235 (citations omitted). In order to demonstrate a supervisory liability claim under § 1983 the Appellants, pursuant to our 1994 decision in *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), were obliged to establish three elements. Those elements are (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like them; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices," and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by them. *Id.* at 799 (quoting *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990)).

Because the Appellants have failed to demonstrate a constitutional injury in connection with the UJC Trial, their supervisory liability claim fails on the third prong of the *Shaw* test, i.e., there is no affirmative causal link between the supervisor's inaction and any constitutional injury suffered by the Appellants. As we earlier observed, *supra* at Part III.A, the Appellants were not expelled by the 1998 UJC Panel, and they were not in any other way deprived of a constitutionally protected interest by that panel. As such, they suffered no consti-

tutional injury in connection with the UJC Trial for which any of the University's supervisory personnel could be liable.[14]

## IV.

Pursuant to the foregoing, we affirm the district court's award of summary judgment.

*AFFIRMED*

---

[14]If the Appellants could demonstrate a constitutional injury, they would nevertheless fail on the second prong of the *Shaw* test because they have not shown deliberate indifference by a UJC supervisor. Harmon maintained frequent contact with the UJC, and the Appellants contend that he went so far as to instruct the 1998 UJC Panel to postpone the UJC Trial. Significantly, after the trial, Harmon declined to impose the sanctions recommended by the UJC and referred the matter to the JRB.

It is doubtful whether the Appellants could make out the first prong of the *Shaw* test, i.e., that supervisors knew that the UJC was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the Appellants. While there have been past objections to, and lawsuits involving, the University's student-operated disciplinary system, *see, e.g., Henson v. Honor Comm. of the Univ. of Virginia*, 719 F.2d 69 (4th Cir. 1983), such difficulties have been with the entirely separate Honor Committee. *See supra* note 2. We need not decide this issue because, as explained above, the Appellants' claim otherwise fails.